**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HOLLAENDER MANUFACTURING COMPANY, Respondent.**

No. 90–6288.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 1, 1991.

Decided Aug. 13, 1991.

Rehearing and Rehearing En Banc
Denied Oct. 1, 1991.

Aileen A. Armstrong, Dep. Associate Gen. Counsel, Collis Suzanne Stocking, Joan Hoyte (argued), N.L.R.B. Office of the Gen. Counsel, Washington, D.C., James L. Ferree, N.L.R.B., Region 9, Cincinnati, Ohio, for petitioner.

Donald B. Hordes (argued and briefed), Mona F. Spitz (briefed), Schwartz, Manes & Ruby, Cincinnati, Ohio, for respondent.

Before MARTIN and MILBURN, Circuit Judges, and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

Petitioner National Labor Relations Board (hereinafter "Board") seeks enforcement of its August 16, 1990 order entered against respondent Hollaender Manufacturing Company (hereinafter "Hollaender"). For the following reasons, we enforce the Board's order.

I.

Hollaender manufactures structural fittings at its manufacturing facility in Evendale, Ohio. The International Association of Machinists and Aerospace Workers (Local Lodge 789, District 34) (hereinafter "Union") has been the certified collective bargaining representative of Hollaender's production and maintenance employees since December 1965. Since 1965, the parties have entered into a series of successive collective bargaining agreements. Because the most recent three-year collective bargaining agreement (hereinafter "agreement") expired on May 31, 1989, Hollaender and the Union agreed to begin labor negotiations on May 8, 1989.

On May 2 or 3, 1989, Phyllis Dugger (a Hollaender employee and Union member) telephoned the Board's office in Cincinnati to ascertain how to decertify the Union at Hollaender. After learning from Dugger that there were thirty (30) Union members at Hollaender, the unidentified Board official purportedly told Dugger that she needed to obtain ten (10) signatures on a decertification petition to initiate decertification proceedings. Consequently, on May 5, 1989, Dugger circulated a petition which read (in its entirety):

## DECERTIFICATION

We the undersigned are rejecting Local Union 787 [sic]. We no longer want

them to represent us, the Hollander [sic] Manufacturing Inc., employee [sic].

Joint Appendix at 121.

After asking at least 23 of the 30 Union members to sign the petition, Dugger obtained 16 signatures. Though Dugger solicited signatures in the presence of the four probationary production and maintenance employees, Dugger did not attempt to obtain the probationary employees' signatures because Dugger did not believe that the probationary employees were part of the certified bargaining unit which the collective bargaining agreement defined as:

All production and maintenance employees of the Company at its plant and operations located at 10285 Wayne Avenue, Cincinnati, Ohio, 45215, including truckdrivers, building maintenance man, shipping and receiving clerk and all other plant clerical employees, but excluding all office clerical employees, guards and professional employees and supevisors [sic] as defined in the Act.

Joint Appendix at 86.

The agreement between Hollaender and the Union defined the status and rights of probationary employees in Article XIII ("Seniority"),

13.8. During the first three (3) months of continuous employment, a new employee shall be considered a probationary employee; he shall not be entitled to any of the benefits of this contract other than the wage rates, and his employment may be terminated at any time during such period. At the end of the probationary period he shall acquire seniority as of the date of his latest hiring.

and Article XXIV ("Union Shop"):

24.2. Newly hired employees shall, as a condition of employment during the term of this Agreement, become and remain members of the Union in good standing thirty (30) days after the date of their employment by the Company.

Despite the express wording of section 24.2 of the agreement, however, the parties stipulated to the truth, but not to the relevance, of the following statement: "In practice, and notwithstanding the provisions of the Union Security Clause, employ-

ees were not requested to join the Union until after they had completed their 90–day probationary period." Joint Appendix at 51. Moreover, the parties stipulated "[t]hat the probationary employees perform the same kind of work as the [non-probationary] production employees." Joint Appendix at 37.

After obtaining the sixteen signatures, Dugger apparently placed a copy of the anti-Union petition on Foreman Marvin Kates' desk where it was discovered by Production Manager Gary Thomas. Thomas subsequently telephoned Hollaender's labor attorney, Donald B. Hordes, for guidance. When asked by Hordes how many employees were in the bargaining unit, and how many employees had signed the decertification petition, Thomas responded that sixteen of Hollaender's thirty production and maintenance employees in the bargaining unit had signed the petition. Believing that a majority of the bargaining unit employees had repudiated the Union's authority, Hordes advised Thomas that the company was no longer obligated to recognize and bargain with the Union.

On May 8, 1989, Hordes (operating under the assumption that probationary employees need not be counted when determining the total number of bargaining unit employees) informed the Union representatives that Hollaender would no longer bargain with the Union in light of the decertification petition. Subsequent to the May 8 meeting: three of the four probationary employees separated from Hollaender under unspecified circumstances; one employee removed his name from the decertification petition; and, one employee added her name to the decertification petition.

On May 9, 1989, Hollaender management circulated a notice, signed by Hollaender's Executive Vice–President and General Manager A. David Echert, to all production and maintenance employees which read (in its entirety):

To all of The Hollaender Mfg. Co. shop employees:

On Friday, May 5, 1989, we received a petition signed by a majority of you stating that you no longer wanted the Ma-chinists Union to represent you for the purposes of collective bargaining.

Based on this employee sentiment, we informed the union at our first bargaining session on Monday, May 8, 1989 that we were now unwilling to enter into negotiations for a new labor agreement. We will, of course, continue to abide by the current union contract which expires on May 31, 1989. After that time, however, we will no longer recognize the Machinists Union as your bargaining representative.

One immediate consequence of all of this is that effective June 1, 1989, we will no longer be deducting union dues of $20.15 per month from your pay check. Secondly, we will implement a new salary package for all of our machine shop employees which will be competitive with other similar companies in the Cincinnati metropolitan area, and which also recognizes your past and current contributions to The Hollaender Mfg. Co.

YOU WILL NOT LOSE ANY OF THE SALARY AND FRINGE BENEFITS YOU CURRENTLY ENJOY.

We will provide further details concerning your salary and benefits in the next couple of weeks.

In the meantime, thanks for your continued patience and support.

THE HOLLAENDER MFG. CO.

A. DAVID ECHERT

Executive Vice–President and General Manager

Joint Appendix at 81.

On May 24, 1989, the Union filed a charge against Hollaender with the National Labor Relations Board for refusing to recognize the Union's representative status. On July 12, 1989, the Board issued its "Complaint and Notice of Hearing" alleging that Hollaender violated Section 8(a)(1) and (5) of the National Labor Relations Act by withdrawing recognition from, and refusing to bargain with, the Union.

On January 10, 1990, Administrative Law Judge Nancy Sherman (hereinafter "ALJ") issued her Decision ordering Hollaender to "recognize and bargain collectively" with

the Union "as the exclusive bargaining representative of Respondent's employees":

> I find that [the four probationary employees] were in the bargaining unit. Initially, I conclude that the probationary employees were within the certified unit, which is described as "All production and maintenance employees" without any exclusions material here. More specifically, it was admitted by Respondent's counsel that the probationary employees "are production and maintenance employees ... they do the same kind of work that the regular employees do." ... Moreover, when the Union was certified in 1965, the probationary status of employees otherwise in the bargaining unit (as probationary production and maintenance employees would have been) would not have excluded them from the unit or rendered them ineligible to vote.... Also, while two of the probationary employees who worked on the day Respondent withdrew recognition (May 8, 1989) did not show up for work on the following day or at any time thereafter, this circumstance would not have rendered them ineligible to vote either on May 8 or on May 5, 1989, the day the petition was signed by certain nonprobationary employees and received by Respondent.... Moreover, the bargaining agreement confirms the inherent probability that the parties intended the contract unit to encompass the entire certified unit. Thus, the contract itself defines the unit as "all employees within the bargaining unit as defined in the National Labor Relations Board in Case No. 9–RC–6474," and otherwise tracks the language of the certification. Probationary employees were entitled under the bargaining agreement to the "wage rates" specified therein, a condition which goes to the marrow of the employment relationship and as to which the Union could not lawfully bind either them or Respondent if the Union were not their bargaining representative. Moreover, under the bargaining agreement a nonprobationary employee's period of service included his probationary period for purposes of seniority and (perhaps) entitlement to vacation and holiday pay. The foregoing evidence that probationary employees were in the contract unit outweighs the evidence relied upon by Respondent....

> In short, the only evidence offered by Respondent in support of its claim that the Union did not in fact enjoy majority status when Respondent withdrew recognition on May 8, 1989, is a petition signed by 16 employees in a unit of 34. A petition thus signed by fewer than half of the unit employees cannot be relied on as an expression of majority disaffection from the Union sufficient to support Respondent's claim of a reasonable and good-faith doubt of majority status. Nor can a claim of reasonable and good-faith doubt be supported by the legally erroneous belief of production control manager Thomas that the 4 probationary employees were not in the bargaining unit, in view of Respondent's knowledge of all the facts which showed that such employees were indeed in the unit.

> For the foregoing reasons, I find that Respondent violated Section 8(a)(5) and (1) of the Act by withdrawing recognition from the Union on May 8, 1989.

Administrative Law Judge's January 10, 1990 Decision at 6–8.

Thereafter, on August 16, 1990, the Board "affirm[ed] the judge's rulings, findings, and conclusions and adopt[ed] the [ALJ's] recommended Order," National Labor Relations Board's August 16, 1990 Decision and Order at 1, which requires Hollaender to recognize the representative status of, and bargain with, the Union.

The Board thereafter applied to this court for enforcement of its August 16, 1990 Order pursuant to 29 U.S.C. § 160(e).

## II.

### A.

"Upon certification by the NLRB as the exclusive bargaining agent for a unit of employees, a union enjoys an irrebuttable presumption of majority support for one year." *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 110 S.Ct. 1542, 108 L.Ed.2d 801 (1990). *See also Fall River*

*Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 37, 107 S.Ct. 2225, 2232, 96 L.Ed.2d 22 (1987) ("[A]fter a union has been certified by the Board as a bargaining-unit representative, it usually is entitled to a conclusive presumption of majority status for one year following the certification."). "During that time, an employer's refusal to bargain with the union is *per se* an unfair labor practice under §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act." *Curtin Matheson Scientific, Inc.*, 110 S.Ct. at 1544. After the first year, the presumption of majority status continues, but is rebuttable:

> Under the Board's long-standing approach, an employer may rebut that presumption by showing that, at the time of the refusal to bargain, either (1) the union did not *in fact* enjoy majority support, or (2) the employer had a "good faith" doubt, founded on a sufficient objective basis, of the union's majority support.

*Id.* at 1545.

Pursuant to the National Labor Relations Act's "overriding policy" of achieving "industrial peace," *Fall River Dyeing & Finishing Corp.*, 482 U.S. at 38, 107 S.Ct. at 2233, 29 U.S.C. § 158(a)(5) provides that "[i]t shall be an unfair labor practice for an employer to refuse to bargain collectively with the representatives of [its] employees." In *Fall River*, the Supreme Court held that the presumption of continuing majority support for a union:

> promot[es] stability in collective-bargaining relationships, without impairing the free choice of employees. In essence, [it] enable[s] a union to concentrate on obtaining and fairly administering a collective-bargaining agreement without worrying that, unless it produces immediate results, it will lose majority support and will be decertified. The presumptions also remove any temptation on the part of the employer to avoid good-faith bargaining in the hope that, by delaying, it will undermine the union's support among the employees. The upshot of the presumptions is to permit unions to develop stable bargaining relationships

with employers, which will enable the unions to pursue the goals of their members, and this pursuit, in turn, will further industrial peace.

*Fall River Dyeing & Finishing Corp.*, 482 U.S. at 38–39, 107 S.Ct. at 2233 (citations omitted).

To prove an actual lack of majority support, the employer must make a numerical showing that a majority of employees opposed the union as of the date that union recognition was withdrawn. To prove reasonable doubt as to a union's majority status, the employer's doubt must be asserted in good faith and must be supported by objective considerations. *See generally Curtin Matheson Scientific, Inc.*, 110 S.Ct. at 1550 n. 8 ("The Board's requirement of some objective evidence indicating ... opposition to the union does not amount to a requirement that the employer prove that the union *in fact* lacks majority status. To show a good-faith doubt, an employer may rely on circumstantial evidence; to show an actual lack of majority support, however, the employer must make a numerical showing that a majority of employees in fact oppose the union."); *Cain's Generator & Armature Co. v. NLRB*, 628 F.2d 933, 934 (6th Cir. 1980) ("In order to withdraw recognition, the employer must disprove majority support by a clear, cogent, and convincing showing of actual loss of majority status or objective considerations to support a good faith doubt of a union's majority status."). "[S]ubjective evidence may be used to bolster the argument that good faith doubts exist." *NLRB v. Pennco, Inc.*, 684 F.2d 340, 342 (6th Cir.), *cert. denied*, 459 U.S. 994, 103 S.Ct. 355, 74 L.Ed.2d 392 (1982). Moreover, "[t]he relevant date to look to in determining the bona fides of the employer's doubts is the date that recognition is withdrawn; subsequent events cannot validate an improper withdrawal of recognition." *Id.* Accordingly, we must affirm the Board's findings regarding majority status (or good faith doubt as to majority status) if "on the record as a whole there is substantial evidence to support" the Board's determinations. *Universal Cam-*

*era Corp. v. NLRB,* 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951).

In the instant action, the Board argues:

Here, it is undisputed that the Union was the certified bargaining representative of the unit's employees; that the Company and the Union negotiated several successive collective-bargaining agreements, the most recent of which was for a three year term from June 1986 [through] May 31, 1989; and that on the afternoon of May 8, 1989, the Company withdrew recognition from the Union and has, since then, refused to bargain. Because the Union enjoyed a rebuttable presumption of majority status on May 8, the Company violated Section 8(a)(5) and (1) of the Act (29 U.S.C. § 158(a)(5) and (1)) unless it can prove its claim that it had at least a good-faith doubt reasonably grounded on objective factors that the Union no longer enjoyed majority status at the time recognition was withdrawn.

The Company contends that its withdrawal of recognition on May 8 was justified by the 16–signature anti-union petition which it received on May 5. This contention is premised on the Company's assertion that the bargaining unit consisted of 30 employees. The Board, however, found that there were 34 employees in the unit including 30 non-probationary and 4 probationary employees. Thus, the Company's calculation concerning the Union's majority status was factually incorrect and failed to establish a reasonably-grounded good-faith doubt sufficient to justify its withdrawal of recognition.

Petitioner's Brief at 11–12. We agree.

Pursuant to the National Labor Relations Act, the Board must determine the appropriate bargaining unit for bargaining representative recognition (and withdrawal of recognition) purposes. *See* 29 U.S.C. § 159(b) ("The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof."). *See also American Hosp. Ass'n v. NLRB,* —— U.S. ——, 111 S.Ct. 1539, 1542, 113 L.Ed.2d 675 (1991) ("[W]henever there is a disagreement about the appropriateness of a unit, the Board shall resolve the dispute."). In carrying out its statutory mandate to determine whether a decertification election is necessary pursuant to 29 U.S.C. § 159(c)(1), the Board recognizes that:

In decertification cases the appropriate unit in which to conduct an election is the certified *or* contract unit. If the certified unit has been changed by contract, the Board relies upon the unit recognized by collective bargaining and on that basis holds an election to determine whether the employees wish to continue being represented.

*Brom Machine & Foundry Co. v. NLRB,* 569 F.2d 1042, 1043 (8th Cir.1978) (quoting *Continental Can Co.,* 217 NLRB 316 (1975)).

At Hollaender, the unit certified by the Board in 1965 (and not altered by later collective bargaining agreements) consisted of:

All production and maintenance employees of the Company at its plant and operations located at 10285 Wayne Avenue, Cincinnati, Ohio, 45215, including truckdrivers, building maintenance man, shipping and receiving clerk and all other plant clerical employees, but excluding all office clerical employees, guards and professional employees and supevisors [sic] as defined in the Act.

Joint Appendix at 86. As the petitioner correctly notes, "There is nothing in this language to suggest the exclusion of probationary production and maintenance employees." Petitioner's Brief at 14. In fact, Hollaender's attorney stipulated that the probationary employees perform the same work (and receive the same pay) as the non-probationary employees do. Moreover, because the collective bargaining agreement defines the probationary employees' conditions of employment, it logically follows that, by entering such an agreement, Hollaender and the Union impliedly agreed

that the probationary employees were members of the bargaining unit represented by the Union.

As bargaining unit members, the four probationary employees would have been entitled to vote in a representation (or decertification) election held on May 5, the day the decertification petition was circulated, or on May 8, the day Hollaender refused to recognize the Union. Because substantial evidence supports the Board's finding that Hollaender's actions disenfranchised four eligible voters (a potentially determinative portion of the bargaining unit electorate), the Board correctly determined that Hollaender had violated the National Labor Relations Act. *See Bear Archery*, 223 NLRB 1169, 1172 (1976) ("[P]robationary employees are clearly included in the bargaining unit.").

### B.

■ On August 16, 1990, the Board adopted the ALJ's recommended Order which stated (in relevant part):

Respondent Hollaender Manufacturing Co., its officers, agents, successors, and assigns, shall:

1. Cease and desist from:

(a) Refusing to recognize and bargain collectively with [the Union] as the exclusive bargaining representative of Respondent's employees....

(b) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) On request, recognize and bargain with [the Union] as the exclusive representative of the employees in the foregoing appropriate unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement.

(b) Post at its facility in Cincinnati, Ohio, copies of the attached notice marked "Appendix."

(c) Notify the Regional Director in writing within 20 days from the date of this Order what steps the Respondent has taken to comply.

Joint Appendix at 149–50.

The Supreme Court has previously held that the Board must fashion an order that serves as "a remedy designed to restore, so far as possible, the status quo that would have obtained but for the wrongful act." *NLRB v. Rutter–Rex Mfg. Co.*, 396 U.S. 258, 265, 90 S.Ct. 417, 421, 24 L.Ed.2d 405 (1969). Because the Board's power to order remedies "is for the Board to wield, not for the courts," *id.* at 263, 90 S.Ct. at 420 (quoting *NLRB v. Seven–Up Bottling Co.*, 344 U.S. 344, 346, 73 S.Ct. 287, 288–89, 97 L.Ed. 377 (1953)), "the remedial power of the Board is a 'broad discretionary one, subject to limited judicial review.'" *Id.* 396 U.S. at 262–63, 90 S.Ct. at 419–20 (quoting *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 405–06, 13 L.Ed.2d 233 (1964)).

Hollaender withdrew Union recognition at a time when Hollaender was not privileged to do so. Accordingly, the Board's Order restored the status quo by reestablishing the bargaining relationship. *See, e.g., Franks Bros. Co. v. NLRB*, 321 U.S. 702, 705, 64 S.Ct. 817, 819, 88 L.Ed. 1020 (1944) ("[A] Board order which requires an employer to bargain with a designated union is not intended to fix a permanent bargaining relationship without regard to new situations that may develop. But, as the remedy here in question recognizes, a bargaining relationship once rightfully established must be permitted to exist and function for a reasonable period in which it can be given a fair chance to succeed. After such a reasonable period the Board may, in a proper proceeding and upon a proper showing, take steps in recognition of changed situations which might make appropriate changed bargaining relationships.").

Though the respondent argues that *Automated Business Sys. v. NLRB*, 497 F.2d 262 (6th Cir.1974), supports its contention that the Board exceeded its authority by issuing a bargaining order, we disagree.

In *Automated Business Sys.*, the Sixth Circuit questioned the propriety of a bargaining order following a decertification *election* (where the union was handily defeated). In the instant action, Hollaender refused to recognize, or bargain with, the Union after unilaterally (and unlawfully) determining that the Union lacked majority support—the Board was not given the opportunity to conduct a decertification election prior to Hollaender's actions. Accordingly, the Board's directives ordering Hollaender to "cease and desist from refusing to recognize and bargain collectively" with the Union, and to "recognize and bargain with [the Union] as the exclusive representative of the employees," restore the status quo by reestablishing the bargaining relationship between Hollaender and the Union.

### III.

For the aforementioned reasons, we enforce the Board's Decision and Order.