**VIRGINIA CONCRETE COMPANY, INCORPORATED, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

Teamsters' Local Union No. 639, Intervenor.

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**VIRGINIA CONCRETE COMPANY, INCORPORATED, Respondent,**

Teamsters' Local Union No. 639, Intervenor.

Nos. 95–1284, 95–1784.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 25, 1995.

Decided Feb. 16, 1996.

**ARGUED:** Roger Kenneth Quillen, Fisher & Phillips, Atlanta, Georgia, for Petitioner. Marion Louise Griffin, National Labor Relations Board, Washington, D.C., for Respondent. Hugh J. Beins, Sr., Beins, Axelrod, Osborne, Mooney & Green, Washington, D.C., for Intervenor. **ON BRIEF:** H. Victor Hansen, Lawrence S. McGoldrick, Howard B. Jackson, Fisher & Phillips, Atlanta, Georgia, for Petitioner. Frederick L. Feinstein, General Counsel, Linda Sher, Acting Assistant General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Charles Donnelly, Supervisory Attorney, Joseph A. Oertel, Senior Litigation Attorney, National Labor Relations Board, Washington, D.C., for Respondent. Jonathan G. Axelrod, Edward M. Gleason, Jr., Beins, Axelrod, Osborne, Mooney & Green, Washington, D.C., for Intervenor.

Before RUSSELL, MICHAEL, and MOTZ, Circuit Judges.

Petition denied, cross-petition granted, and order enforced by published opinion. Judge MICHAEL wrote the opinion, in which Judge RUSSELL and Judge MOTZ joined.

## OPINION

MICHAEL, Circuit Judge:

This case is about an employer's count of unit employees eligible to vote for purposes of a union decertification petition submitted in the aftermath of an economic strike. Petitioner/Cross–Respondent, Virginia Concrete Company, Inc. ("Virginia Concrete" or the "Company"), seeks review of an order of the Respondent/Cross–Petitioner, National Labor Relations Board (the "Board"), holding Virginia Concrete in violation of sections 8(a)(1) and (a)(5) of the National Labor Relations Act ("NLRA" or the "Act"), 29 U.S.C. §§ 158(a)(1) and (a)(5). According to the Board, Virginia Concrete failed to account for sixteen striking employees when it was presented with a petition seeking decertification of the Intervenor, Teamsters Local

Union No. 639 ("the Teamsters" or "the Union"), as the collective bargaining representative of unit employees. Had Virginia Concrete included these employees in the count when determining the size of the unit, then the Union would have retained the majority support of unit employees and the right to represent the employees as their collective bargaining representative.

The decision to withdraw recognition provided Virginia Concrete with the basis for instituting unilateral changes to the terms and conditions of employment previously agreed upon by Virginia Concrete and the Union. Among other things, the Company ceased making payments to the Union's health, welfare, and pension trust funds. Such unilateral changes are in violation of the Act if the Company's withdrawal of recognition was improper.

For the reasons we give below, we find that substantial evidence supports the Board's determination that Virginia Concrete miscounted the size of the unit of employees eligible to vote when it was presented with the decertification petition. We also find that substantial evidence supports the Board's determination that Virginia Concrete did not have a good faith and reasonably grounded doubt, founded upon a sufficient objective basis, that the Union lacked majority support at the time the decertification petition was presented. We therefore deny Virginia Concrete's petition, and we grant the Board's cross-petition and enforce its order.

## I.

### A.

Virginia Concrete produces, sells, and delivers ready-mix concrete in Northern Virginia to concrete subcontractors and builders in the construction industry. Since at least 1970 the Teamsters have represented Virginia Concrete's ready-mix and dump truck drivers and plant and repair shop employees.[1]

Beginning in 1989 the Company experienced a substantial diminution in business: its volume of business was reduced from 1,300,000 yards of concrete delivered in 1989 to 480,000 yards delivered in 1993. The Company attributes this diminution to changes in the tax laws, the collapse of savings and loan institutions, increased competition, and the general economic downturn in the construction business after the boom of the mid–1980s. According to John McMahon, a Company witness with extensive experience in the Northern Virginia commercial construction industry, the industry as a whole was going through more than a normal business cycle; it had experienced a "classic down-sizing," and it would not return to the boom days of the 1980s within any reasonable period of time.

In response to this economic downturn the Company closed several of its plants, sold some of its trucking fleet and, on January 4, 1991, laid off 56 unit employees. In January 1992 the Company again laid off employees. The layoff letters in both January 1991 and January 1992 said that the layoffs were for an "indefinite" period, that the employees might be called back to work when business conditions improved, and that management hoped that the economic climate would soon improve. The Company never said that the jobs of the laid-off employees had been permanently eliminated or that the employment relationship had been terminated. However, a provision of the collective bargaining agreement in force at the time of the 1991 layoffs provided that, "Seniority of employees and

---

1. The unit, admitted to be appropriate for purposes of collective bargaining within the meaning of section 9(b) of the Act, is described as follows:

All mixer truck drivers, master electricians, ready-mix mechanics and mechanic helpers, equipment operators, tractor trailer and ten wheel dump drivers, shop mechanics and welders, shop mechanic and welder helpers, tire maintenance men and helpers employed by Virginia Concrete at its operations in the City of Alexandria, and the counties of Arlington, Caroline, Fairfax, Loudon, and Prince William, and elsewhere where the Union has organizing jurisdiction, excluding all other employees, executives, administrative, professional, office and clerical employees, guards and supervisors as defined in the Act.

Each category of employees (*i.e.*, ready-mix drivers, plant employees, dump truck drivers, and repair shop employees) is covered by a separate contractual addendum and seniority list.

the employment relationship shall be terminated ... by ... layoff exceeding eighteen months...." [2]

In May 1991 the collective bargaining agreement expired, but the Company and the Union agreed to work under the expired agreement while undertaking negotiations towards a new agreement. After negotiations had proved unsuccessful for more than a year, the Union began an economic strike on June 4, 1992.

Thereafter, the Company sent letters to 52 of the laid-off ready-mix drivers and plant maintenance employees recalling them from layoff; no recall letters were sent to laid-off shop employees. In the recall letters the Company informed the employees that the Company and the Union were engaged in a labor dispute, and the Company asked each employee to notify the Company whether he intended to return to work or whether he elected to participate in the strike. Of the employees that responded to the recall letters, many said that they wished to come back to work after the strike concluded but that they would not cross the picket line. At least eleven of the employees laid off in 1991 (all of whom responded to the recall letters) participated in the strike, joining the picket lines. These eleven employees are all drivers.

The strike ended on July 1, 1992, with the Union's unconditional offer to return to work on behalf of all the striking employees. The Company responded on July 2, stating that it would be calling some of the strikers back to work and that it would place the remaining strikers on a preferential hiring list; the Union was told that the strikers on the preferential hiring list would be called to work as soon as positions became available. In total, two strikers were recalled, and the Company never actually created the preferential hiring list. During the strike the Company had hired 93 permanent replacement workers to fill unit positions. None of the replacement workers filled shop employee positions.

On July 20, 1992, the Company's personnel manager, Glenn Rupert, informed the Union by letter that there were 131 existing unit jobs, consisting of 87 ready-mix driver positions, 18 plant employee positions, 10 tractor trailer positions, and 16 repair shop positions. Rupert said that there were no positions presently available.

On August 7, 1992, Rupert notified the Union that the Company had planned to re-open its closed plant at Shirlington. However, Rupert said that the Shirlington plant had not yet been re-opened because of a water main break and that he did know when the plant would re-open or how many drivers might be based at that plant.

On August 13, 1992, two employees gave the Company's vice president for operations, Diggs Bishop, a petition stating that its 117 signatories no longer wished to be represented by the Union. By the next day Bishop, together with Rupert, and the Company's president, George Hossenlopp, determined that there were 116 valid signatures on the petition and that for purposes of determining majority status the bargaining unit consisted of 221 employees. To reach this latter figure, Bishop included in the count 128 unit employees who were then working, plus 93 strikers who had been permanently replaced. Bishop therefore concluded that the 116 employees who signed the petition constituted a majority of the unit employees eligible to vote by a count of 116 to 105.

Bishop did not include in the size of the unit the eleven laid-off employees who had been recalled to work in June 1992 and who then participated in the strike. Nor did Bishop include five shop employees who had been working at the time of the strike but whose jobs were not filled by permanent replacement workers during the strike. If these sixteen employees are added to the size of the unit, then the decertification petition fails by a count of 121 to 116.

On August 14, 1992, the Company notified the Union that it was withdrawing recognition because, according to the Company, "a substantial majority of unit employees" have indicated that they no longer desire union representation. Thereafter, the Company instituted unilateral changes to unit employees'

---

**2.** By April 1992 the Company had recalled most of the employees laid off in January 1992. No employees laid off in January 1991 had been recalled by April 1992, however.

employment terms, including work scheduling for ready-mix drivers, scheduling and payment of overtime, wage rate classifications, and restrictions on working outside of one's classification. The Company also ceased making payments to the Union's health, welfare, and pension trust funds.

### B.

The Union filed unfair labor practices charges with the Board, which resulted in the issuance of a complaint against Virginia Concrete on May 26, 1993. The complaint alleged that Virginia Concrete violated sections 8(a)(1), (3), and (5) of the Act by improperly withdrawing recognition from the Union, by unilaterally changing terms and conditions of employment, and by failing to consider economic strikers as being among those entitled to preferential recall or rehire.

After evidentiary hearings in January and February 1994, an administrative law judge held Virginia Concrete in violation of the Act.[3] The ALJ found that the eleven laid-off employees were economic strikers for purposes of section 9(c)(3) of the Act. Therefore, the eleven laid-off employees could not be disenfranchised for at least twelve months after the strike began unless they had secured other employment or their jobs were in fact permanently eliminated and the Company's non-strike-related reasons for eliminating the jobs were substantial. The ALJ then rejected the Company's argument that the eleven laid-off employees had no reasonable expectation of recall and that the employees' jobs had been eliminated for reasons unrelated to the strike. As for the five shop employees, the ALJ also found that the Company had failed to establish permanent job elimination for substantial non-strike-related reasons.

Having found that the Company undercounted the size of the unit by sixteen positions (and that the decertification petition had therefore failed to show that the Union actually lacked majority support), the ALJ determined that the Company did not have a good faith and reasonably grounded doubt, founded upon a sufficient objective basis, that the Union lacked majority support at the time the petition was presented. Specifically, the ALJ found that the Company had to disenfranchise a sizable portion of the unit in order to conclude that the Union lacked majority support and that the Company reached its conclusion "through faulty reasoning." The ALJ also found that it was questionable whether vice president Bishop approached the count in good faith because he ignored existing employee lists to reach the conclusion that there were fewer unit employees than those lists indicated.

Based on this analysis, the ALJ determined that the Company's withdrawal of recognition from the Union was improper. Accordingly, the ALJ held that the Company's decision to change the unit employees' terms and conditions of employment and the Company's failure to make payments to the Union's health, welfare, and pension trusts violated sections 8(a)(5) and (a)(1) of the Act.

As a remedy the ALJ sought to restore the *status quo ante*. Among other things, he recommended to the Board that the Company restore, to the extent requested by the Union, all terms and conditions of employment which were in effect immediately prior to the withdrawal of recognition. The ALJ also recommended that the Company make whole any employee who may have been detrimentally affected by the changes in terms and conditions of employment, with interest on any monetary losses any employee may have suffered. And the ALJ recommended that the Company make whole all fringe benefit funds for any loss the funds may have suffered as a result of the unilateral modification of terms and conditions of the collective bargaining agreement.

On review the Board affirmed the ALJ's rulings, findings (as modified), and conclusions and adopted the ALJ's recommended order. The Board agreed with the ALJ that the eleven laid-off employees should have been included in the unit of eligible voters and that the Company had failed to demonstrate that the jobs of the eleven employees had been eliminated. Based on the reason-

---

**3.** The ALJ's decision is appended to the Board's subsequent decision and order. See *Virginia* *Concrete Co., Inc.,* 316 N.L.R.B. 261, 1995 WL 54444 (1995).

ing of the ALJ, the Board also agreed that the five shop employees were improperly excluded from the unit of eligible voters and that the Company did not have a good faith doubt of the Union's majority status. In addition, since the Union continued to represent the unit employees and those employees retained an interest in the viability of the fringe benefit funds, the Board adopted the ALJ's recommended order requiring the Company to make whole the funds.

On petition to this court Virginia Concrete primarily argues that the Board (and the ALJ) erred in including the eleven laid-off employees and the five shop employees in the unit of eligible voters. Virginia Concrete also argues that even if these employees are in fact properly included in the unit, it possessed (based on the decertification petition) a good faith doubt of the Union's majority status. Finally, Virginia Concrete argues that even if its withdrawal of recognition was improper, this Court should condition enforcement of the Board's order on the outcome of an election to be held within 90 days or, in the alternative, decline to enforce the Board's order to the extent that it requires the Company to make whole the fringe benefit funds.

## II.

■ Our review of the record is limited in scope. While we are, of course, obligated to correct errors of law made by the Board, *American Trucking Assocs., Inc. v. NLRB*, 734 F.2d 966, 977 (4th Cir.1984), we must sustain the Board's factual findings "if supported by substantial evidence on the record considered as a whole," NLRA § 10(e), 29 U.S.C. § 160(e). And we "may [not] displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *see NLRB v. Daniel Constr. Co.*, 731 F.2d 191, 193 (4th Cir.1984). The determination of whether an employer has presented sufficient evidence regarding the loss of majority status or good faith doubt is a question of fact for the Board, subject to this limited

standard of review. *Superior Bakery, Inc. v. NLRB*, 893 F.2d 493, 497 (2d Cir.1990).

■ The employer has the burden of proof to show loss of majority status or good faith doubt because there is a rebuttable presumption that a union enjoys continuing majority support. *See Laidlaw Waste Sys., Inc.*, 307 N.L.R.B. 1211, 1211, 1992 WL 169083 (1992). This presumption is central to a union's mission to represent and negotiate effectively with management on behalf of employees. As the Supreme Court has explained:

> [The presumption] enable[s] a union to concentrate on obtaining and fairly administering a collective-bargaining agreement without worrying that, unless it produces immediate results, it will lose majority support and will be decertified. The presumption[ ] also remove[s] any temptation on the part of the employer to avoid good-faith bargaining in the hope that, by delaying, it will undermine the union's support among the employees.

*Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 38, 107 S.Ct. 2225, 2233, 96 L.Ed.2d 22 (1987).

Keeping in mind the presumption in favor of a union's continuing majority support and the limited scope of our review, we turn to the law of employee voter eligibility and Virginia Concrete's challenges to the Board's (and the ALJ's) factual findings and legal conclusions.

## III.

Section 9(c)(3) of the NLRA, 29 U.S.C. § 159(c)(3), provides in pertinent part, "Employees engaged in an economic strike who are not entitled to reinstatement shall be eligible to vote under such regulations as the Board shall find are consistent with the purposes and provisions of the Act in any election conducted within twelve months after the commencement of the strike." Section 2(3) of the NLRA, 29 U.S.C. § 152(3), provides, "The term 'employee' shall include any employee ... and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute...."

Pursuant to its statutory mandate the Board has construed section 9(c)(3) to mean that permanently replaced strikers retain the right to vote in an election conducted within twelve months after the commencement of an economic strike. *E.g., St. Joe Minerals Corp.,* 295 N.L.R.B. 517, 517, 1989 WL 224217 (1989); *W. Wilton Wood, Inc.,* 127 N.L.R.B. 1675, 1677 (1960).[4] In addition, the Board has construed section 9(c)(3) to mean that an economic striker, whether replaced or not, retains the status of an employee entitled to vote within twelve months of a strike unless prior to the election (1) the employee obtains permanent employment elsewhere, (2) the employer eliminates the employee's job for economic reasons, or (3) the employer discharges or refuses to reinstate the employee for misconduct rendering him or her unsuitable for reemployment. *Lamb–Grays Harbor Co.,* 295 N.L.R.B. 355, 357, 1989 WL 224138 (1989); *see St. Joe Minerals Corp.,* 295 N.L.R.B. at 517. Concomitant with its burden to show that the union lacks majority support, the employer bears the burden to show that the jobs of economic strikers were in fact permanently eliminated and that the employer's non-strike-related reasons for the permanent elimination were substantial. *Lamb–Grays Harbor Co.,* 295 N.L.R.B. at 357; *see NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 378 & n. 4, 88 S.Ct. 543, 546 & n. 4, 19 L.Ed.2d 614 (1967).

## A.

## THE ELEVEN LAID–OFF EMPLOYEES

### 1.

Our first task is to determine whether the Board and the ALJ properly found that the eleven employees laid off in 1991 achieved the status of economic strikers under section 9(c)(3) of the Act. To reach a determination on this issue, we must also decide whether the eleven laid-off employees remained "employees" at the time of the strike. For if they were not employees at that time, then for purposes of section 9(c)(3), it is axiomatic that they cannot be considered "[e]mployees engaged in an economic strike. . . ."

The Company argues that the Board and the ALJ incorrectly relied upon the fact that the eleven laid-off employees had preferential rehire rights under *Laidlaw Corp.,* 171 N.L.R.B. 1366 (1968), enf'd 414 F.2d 99 (7th Cir.1969), to reach the conclusion that the laid-off employees were eligible to vote under section 9(c)(3). For the first time in its Reply Brief, the Company also argues that under section 2(3) of the Act the eleven were not employees at the time of the strike because they were not individuals "whose work has ceased as a consequence of, or in connection with, any current labor dispute. . . ." Neither of these arguments, however, undermines the conclusion that the eleven laid-off employees obtained the status of economic strikers.

While it is true that the ALJ relied upon the fact that the eleven laid-off employees obtained preferential rehire rights under *Laidlaw Corp.,* the Company mischaracterizes what the ALJ actually decided.[5] In particular, the ALJ did not hold—as the Company argues—that if a laid-off employee is entitled to preferential rehire rights under *Laidlaw,* such an employee is automatically eligible to vote under section 9(c)(3).[6] Rath-

**4.** The Supreme Court has recognized that the Board may interpret statutory language through adjudicative proceedings. *See NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 291–95, 94 S.Ct. 1757, 1770–72, 40 L.Ed.2d 134 (1974). We therefore reject the Company's argument that the Board has failed to meet its statutory mandate under section 9(c)(3) to promulgate "regulations as the Board shall find are consistent with the purposes and provisions of the Act. . . ."

**5.** The Board did not expressly pass on the issue of whether the eleven achieved the status of economic strikers. Rather, the Board evidently assumed as much and moved directly to the issue

of whether the Company had carried its burden to show that the jobs of the eleven had in fact been permanently eliminated. The ALJ, whose opinion the Board affirmed, provided the economic striker analysis.

**6.** In *Laidlaw Corp.,* the Board held that:

Economic strikers who unconditionally apply for reinstatement at the time when their positions are filled by permanent replacements: (1) remain employees; and (2) are entitled to full reinstatement upon the departure of replacements unless they have in the meantime acquired regular and substantially equivalent

er, the ALJ concluded that when, as here, a laid-off employee is entitled to rehire rights under *Laidlaw*, such an employee achieves the status of an economic striker for purposes of section 9(c)(3). And, as the ALJ made clear, even if a laid-off employee obtains the status of an economic striker, ultimate voter eligibility remains contingent upon whether his job has in fact been eliminated. *Cf. St. Joe Minerals Corp.*, 295 N.L.R.B. 517, 518 n. 7 (1989) (emphasizing that "economic strikers' *voting eligibility rights* are governed by the Board's interpretation of Sec. 9(c)(3) and are independent of reinstatement rights as defined by *Laidlaw Corp.* ....") (emphasis supplied).

This, of course, makes sense. When a laid-off employee rejects an offer to return to work and chooses instead to participate in a strike, the employee has shown that he possesses a stake in the outcome of the strike. The laid-off employee—as with other striking employees—has in fact given up the opportunity to work in order to participate in the strike. While the laid-off employee may not have the same opportunity to return to work as other striking employees at the conclusion of the strike, that lesser opportunity does not diminish the fact that the laid-off employee, so long as he remains on strike, has no opportunity whatsoever to return to work. Such an employee is therefore an economic striker for purposes of section 9(c)(3).

In this case the ALJ specifically found that (1) the Company recalled the eleven employees from layoff at the time of the strike, (2) the eleven employees told the Company that they wished to come back to work but that they would not cross the picket lines, (3) the eleven employees joined the strike by picketing the Company, and (4) the Company had reasonable notice of the eleven employees'

strike participation. The Company has pointed to nothing in the record that shows that these factual findings are not supported by substantial evidence. Accordingly, we will not disturb the ALJ's analysis that the eleven were economic strikers under section 9(c)(3).

■ The Company's argument under section 2(3) fares no better. While that section provides that the term "employee" includes an individual "whose work has ceased as a consequence of, or in connection with, any current labor dispute ...," section 2(3) also provides that "[t]he term 'employee' shall include any employee...." Here, because the eleven employees who participated in the strike were laid off in January of 1991, the Company argues that the work of the eleven did not "cease[ ] as a consequence of, or in connection with, any current labor dispute...." We need not decide this issue however, because it is clear that a contractual employment relationship continued to exist between the Company and the eleven laid-off employees at the time the strike began in June of 1992 and, thus, these employees fall within the "any employee" language of section 2(3).[7]

As we discuss in Part III.A.2. *infra*, the Company relies heavily on the fact that the expired collective bargaining agreement under which the parties continued to work provided that the employment relationship between the Company and any of its employees would terminate as a result of "layoff exceeding eighteen months...." And, in particular, the Company relies on this provision in support of its argument that the eleven employees were terminated at the time the decertification petition was presented in August of 1992. The Company does not, however,

employment, or the employer can sustain his burden of proof that failure to offer full reinstatement was for legitimate and substantial business reasons.

171 N.L.R.B. at 1369–70. In *Rockwood & Co.*, 281 N.L.R.B. 862 (1986), and *Brinkerhoff Signal Drilling Co.*, 264 N.L.R.B. 348 (1982), the Board held that employees that are laid off prior to a strike and then participate in the strike are entitled to preferential rehire rights under *Laidlaw Corp.* Here, in a hearing before the ALJ, counsel for the Company admitted, "In fact, if any laid-

off employees joined the strike, the company deems them to be on a preferential hiring list."

7. The ALJ and the Board did not have the occasion to decide the Company's argument under section 2(3), which the Company has raised for the first time in its Reply Brief to this court. While we are inclined to say that the argument has therefore been waived, because the eleven laid-off employees fit easily within the "any employee" language of section 2(3), we address the Company's argument under this part of section 2(3).

rely on this provision when arguing that the eleven employees do not fall within section 2(3). To do so would undermine the Company's argument.

The facts show that the eleven employees were laid off in January of 1991 and that the strike began in June of 1992. That is a span of seventeen months. Thus, the eleven employees had not been on layoff for eighteen months at the time of the strike (nor, as we will explain, were they laid off for over eighteen months at the time of the decertification petition). Indeed, pursuant to the eighteen-month rule contained in the collective bargaining agreement, it is indisputable that there existed an employment relationship between the Company and the eleven laid-off employees when the strike began in June 1992. By definition, therefore, the eleven fall within the term "any employee" under section 2(3) whether or not their work "has ceased as a consequence of, or in connection with, any current labor dispute...."

Accordingly, we agree with the ALJ that the eleven laid-off employees obtained the status of economic strikers. And thus, whether the eleven employees were eligible to vote depends upon whether their jobs had in fact been permanently eliminated at the time the decertification petition was presented. We now turn to that inquiry.

2.

At the outset, we emphasize that the eleven laid-off employees were unreplaced economic strikers, not replaced economic strikers. When the eleven were recalled to work in June 1992, they were recalled to fill the positions of striking employees. While, as we have explained, the decision that the eleven made to refuse the offers to return to work and instead to participate in the strike made the eleven laid-off employees economic strikers, there is no evidence in the record to suggest that any of the 93 permanent replacement workers that the Company hired during the strike assumed the job positions that the eleven laid-off employees held prior to their layoff in January 1991. Both the decision of the ALJ and the Board were based on the factually supported premise that the eleven laid-off employees were unre-

placed economic strikers. On review before this court, however, the Board has also argued that the eleven were replaced economic strikers—an argument unsupported by the record and one we decline to accept.

In addition, unlike the issue of whether the eleven laid-off employees achieved the status of economic strikers, the issue of whether the jobs of the eleven were in fact permanently eliminated is determined with reference to the time that the decertification petition was presented, not the time when the strike began. We therefore review the record to determine whether substantial evidence supports the Board's and ALJ's factual finding that the Company failed to carry its burden of showing that jobs of the eleven were not in fact permanently eliminated for economic reasons as of August 1992. However, in making that review, events occurring before, during, and after the strike are relevant in determining whether the jobs were in fact permanently eliminated. *See Lamb–Grays Harbor Co.*, 295 N.L.R.B. at 355–56 (facts showed that strike began in October 1986; economic downturn began January 1987; union was notified of job termination in July 1987; and election was held thereafter).

Here, the ALJ cited several factors showing that the Company failed to carry its burden to establish permanent job elimination of the eleven employees laid off in January 1991:

(1) The employees retained contractual rights to recall at the time of the strike.

(2) The employees were still carried on the seniority rosters.

(3) When the strike occurred, the employees were recalled.

(4) The Company never informed the Union or the employees that the jobs had been eliminated.

(5) The Company still employed workers in the same job classification.

(6) Although the Company had been forced to close some of its plants and sell some trucks, the plants could be re-opened and more trucks purchased or leased as needed.

(7) Most of the employees laid off in 1992 had been recalled.

The ALJ then found that the Company's "offers to recall [the eleven employees], their responses to those offers and their strike-related activities, resolved the ambiguities in favor of [the eleven's] continued employee status."

Moreover, while the Board recognized in its decision that the Company had suffered "a downturn in business" and that the Company "speculate[d] that this downturn resulted in the loss of jobs," the Board found that the Company failed to come forth with sufficient evidence to establish that all (or any ascertainable number) of the positions of the laid-off employees were eliminated. The Board emphasized that the Company never informed the eleven employees that their jobs had been eliminated. And, in fact, the Company had recalled the eleven to work.

We find that these facts show that substantial evidence supports the Board's decision that the eleven laid-off employees, as economic strikers, retained their voter eligibility at the time the decertification petition was presented. Indeed, given the circumstances under which this case arose, we consider it especially important that the Board (and the ALJ) relied upon the fact that the Company never informed the Union that the jobs of the eleven were in fact eliminated until after the decertification petition was presented.

In particular, the Company had recalled the eleven to work two months prior to the presentation of the decertification petition. The Company was on notice that the eleven would have returned to work but for the strike and that the eleven were participating in the strike. And the Company concedes that if a sufficient number of positions became available the eleven were entitled to reinstatement. Yet, in the face of these facts, the Company took the high risk approach of unilaterally refusing to recognize the Union upon the presentation of the petition even though such refusal required the Company (by its own choosing) to discount employees whose employment was never expressly terminated. Compare Lamb–Grays Harbor Co., 295 N.L.R.B. at 356 (employer informed union prior to election that jobs were terminated) with St. Joe Minerals Corp., 295 N.L.R.B. 517, 517 & 522–23, 1989 WL 224217 (1989) (upholding ALJ's determination of size of unit of eligible voters in Board-directed election; ALJ reduced size of unit, finding that while Union was not informed of permanent job elimination, employer's marketable output of ore could be achieved with reduced number of employees and that employer's need for mine workers had been reduced because of move to automation and flooding of mines).

The Company, nonetheless, puts forth a number of facts that it alleges that the Board ignored, misunderstood, or misapplied. Again, the scope of our review of the record is limited. So long as substantial evidence supports the Board's decision, that decision must stand even though we might have reached a different result had this case been before us de novo. While we will address each of the Company's allegations of factual error, when the alleged errors are seen in light of this standard of review, the most that may be said is that the record supports two conflicting views. That is not enough to allow us to disturb the Board's decision.

The Company claims that the Board (1) ignored the provision of the collective bargaining agreement that terminated the employment relationship for layoff exceeding eighteen months, (2) misunderstood the time line in this case because the Board's decision refers to a July 4, 1992, letter recalling the eleven employees when, in actuality, the recall letters were sent on June 4, 1992, (3) failed to consider that all 93 replaced economic strikers would have to be recalled to work before the eleven unreplaced economic strikers could be recalled, and (4) misapplied the factors that the ALJ listed in determining that the Company failed to demonstrate permanent job elimination based on economic concerns.

■ Contrary to the Company's argument, the fact that the expired collective bargaining agreement terminated the employment relationship of an employee on layoff for more than eighteen months does not show that the jobs of the eleven employees

laid off in January of 1991 were terminated prior to August of 1992. The reason for this should be fairly obvious by now. When the Company recalled the eleven employees in June of 1992 (a date prior to the expiration of eighteen months), the layoff status of the eleven employees ended because there was now employment available and the eleven had been offered the opportunity to return to work. That the eleven did not return to work because they chose to honor the strike does not mean that the Company can continue to label them laid-off employees for purposes of the eighteen-month rule when the Company itself sought to recall them before eighteen months expired. Simply put, the eighteen-month rule does not show that the jobs of the eleven were permanently eliminated because the eleven employees were not in fact laid off for eighteen months.

It also therefore makes little difference that the Board used an incorrect date when relying upon the recall letters to show that the Company failed to carry its burden of demonstrating permanent job elimination. In essence, the Company's argument is that because the Board mistakenly believed that the recall letters were issued to the eleven employees more than eighteen months after their layoff, the Board must have also mistakenly believed that the Company had decided to waive the eighteen-month rule. These alleged mistakes then caused the Board to find that the employment status of the eleven continued into August of 1992. Yet, as explained above, because the eighteen-month rule did not terminate the employment relationship between the eleven employees and the Company, even assuming that we are not confronted here with a mere typographical error, it is irrelevant that the Board mentioned July 4, 1992, and not June 4, 1992, as the date upon which the recall letters were sent. Again, the evidence shows the layoff status of the eleven employees ceased on June 4, 1992, because the Company recalled the employees to work on that date.

The evidence, of course, also shows that the Company promised the Union that it would create a preferential rehire list—a promise that the Company failed to keep. Nevertheless, the Company claims that if it had created such a list, the reinstatement rights of the eleven would have been subordinated to the reinstatement rights of the 93 replaced economic strikers. Thus, according to the Company, because of the depressed economic climate in the concrete business, the eleven had no reasonable expectation of recall and their jobs were in fact eliminated.

We must disagree with the Company's argument. Pursuant to the Board's decision in *Lamb–Grays Harbor Company*, the Company is foreclosed from putting forth strike-related reasons as the primary basis for showing permanent job elimination. Here, the Company is attempting to do just that because it is only through the loss of available positions due to the hiring of permanent replacement workers that the eleven laid-off employees' expectation of recall has been diminished.

Furthermore, we cannot say that this expectation of recall was unreasonable because the Company had plans to re-open its plant in Shirlington at the time the decertification petition was presented. The re-opening of that plant was not contingent upon any factor related to the strike; rather, the plant had remained closed because of a water main break. With the re-opening of the Shirlington plant, the Company would need to recall drivers back to work, though the Company did not know the exact number.

Thus, *but for the strike*, one would expect that some, if not all, of the eleven employees previously laid off would have been asked to return to work. It is *that* reasonable expectation of recall that is at issue, not the eleven's expectation of recall after having their positions subordinated by the 93 replaced economic strikers. To hold otherwise would allow the Company to put forth strike-related reasons (*i.e.,* the loss of available positions due to the hiring of permanent replacement workers) as the primary basis for showing permanent job elimination—an avenue of inquiry firmly closed by the decision in *Lamb–Grays Harbor Company.*[8]

8. It is true that in the absence of the strike the eighteen-month rule would have terminated the

We must also disagree with the Company's argument that other factors relied upon by the Board and the ALJ are insufficient to demonstrate that the Company failed to carry its burden of showing the jobs of the eleven laid off employees were not permanently eliminated. As the ALJ's decision points out, the Company never sold any of its plants or ceased employing workers in the same classification as the eleven workers. Indeed, the fact that the Company planned to re-open the closed plant at Shirlington and place drivers there supports the conclusion that the Company had failed to establish permanent job elimination even in the face of its recent decline in business. *See Gulf States Paper Corp.,* 219 N.L.R.B. 806, 807, 1975 WL 5842 (1975) (employer failed to offer sufficient evidence showing permanent job elimination when the employer would have been forced to lay off striking employees because of economic considerations resulting in a decrease in the number of orders being placed with the employer); *Globe Molded Plastics Co.,* 200 N.L.R.B. 377, 378, 1972 WL 4600 (1972) (employer failed to offer sufficient evidence showing permanent job elimination when employer alleged that jobs had been terminated due to depressed economic conditions in the plastics industry, a loss in the volume of work, and difficulties in obtaining new customers). We therefore conclude that when the record is considered as a whole, substantial evidence supports the Board's decision that the eleven laid-off employees retained voting eligibility rights at the time the decertification petition was presented.

### B.

### THE FIVE SHOP WORKERS

█ The Company claims that five shop jobs were eliminated during the strike and therefore the workers who held these positions were not eligible to vote at the time the decertification petition was presented.

The Company emphasizes that, unlike the situation with the eleven laid-off employees, it provided express notice to the Union that the five shop jobs were terminated prior to the submission of the petition. The ALJ, however, concluded (and the Board agreed) that the Company did not carry its burden of showing that these jobs had been permanently eliminated for non-strike-related reasons because the Company failed to show that it suffered any fleet reductions during the strike. We agree with the ALJ and the Board.

The five shop employees were working for the Company at the time the strike commenced. Accordingly, they are economic strikers eligible to vote for the twelve months following the strike unless the Company shows that their jobs were eliminated for non-strike related reasons. The Company, however, has failed to point to any economic factors that demonstrably worsened in the ten weeks between the time the strike began and the time the petition was presented. In the absence of such evidence, we cannot say that the ALJ and the Board erred when finding that these five positions should be added to the size of the unit.

Furthermore, even if we were to accept the argument that notice to the Union and employees of permanent job elimination is sufficient to carry the Company's burden of proof, the Company still cannot succeed on its claim that five repair shop jobs were in fact permanently eliminated.[9] In particular, in its letter of July 20, 1992, the Company only informed the Union that four jobs had been eliminated, not five. That is, the Com-

---

employment relationship between the Company and the laid-off employees prior to the time the Shirlington plant was scheduled to re-open. However, just as the Company failed to notify the Union that the jobs of the eleven were permanently eliminated, the Company—so far as the record shows—never expressly said that it would use the eighteen-month rule as a basis for denying recall to a laid-off employee if a position subsequently became available.

9. We note, however, that there is nothing inconsistent about our discussion of notice with respect to the jobs of the eleven laid-off employees and the conclusion that when economic factors remain constant, an employer does not carry its burden merely by informing the union that jobs have been terminated. That is, without changed economic factors proffered in support of the decision to eliminate jobs, notice alone is not sufficient evidence upon which an employer can meet its burden.

pany said that there were 16 shop positions. Yet, when the petition was presented, the Company counted only 15 shop positions. Thus, even if the Company had eliminated the shop jobs based on economic considerations, it would appear that only four jobs were eliminated. That leaves one additional employee, which, when counted with the eleven laid-off employees, would give the Union a majority by a count of 117 to 116.

## IV.

■ The Board and ALJ also found that the Company did not have a good faith doubt that the Union lacked majority support because (1) the Company reached its conclusion "through faulty reasoning" and (2) the Company ignored existing employee lists when determining eligible voters.

As for the five shop workers, it is clear that the Company did not have a good faith basis for their exclusion—the July 20, 1992, letter establishes that fact.

As for the eleven laid-off employees, the Company claims that the ALJ's assertion of "faulty reasoning" simply means that the Company failed to anticipate the ALJ's decision, not that it lacked a good faith basis for not including the employees. And the Company stresses that so long as it did not have actual notice of the picketing activity of the eleven laid-off employees, it has a good faith doubt of the Union's majority status.

Yet, the ALJ specifically found that the Company (1) recalled the eleven employees, (2) was on notice that they would honor the strike, (3) observed picketing (and, thus, could see—if it wished—that the eleven employees were participating), (4) considered the employees as having preferential rehire rights, and (5) never informed the Union that the jobs of the eleven had in fact been permanently eliminated. Moreover, the ALJ

found that vice president Bishop ignored existing employee lists and numbers prepared by personnel manager Rupert immediately prior to the withdrawal of recognition. According to the ALJ, one must therefore question the good faith basis with which Bishop approached the count of eligible employees. Indeed, Bishop's failure to utilize the most current employee lists "suggests an effort to manipulate the numbers so as to arrive at a desired conclusion." [10]

Taken together, these facts provide ample support for the Board's and ALJ's decision that the Company lacked good faith. See, e.g., NLRB v. Hollaender Mfg. Co., 942 F.2d 321, 327 (6th Cir.1991) (upholding Board's finding that employer lacked good faith basis for withdrawing recognition when employer disenfranchised "a potentially determinative portion of the bargaining unit electorate").

## V.

■ The Board's order seeks to restore the status quo ante. Among other things, it seeks to make the Union and unit employees whole for any losses suffered as a result of the Company's unilateral decision to cease making payments to the Union's health, welfare, and pension trust funds. The funds are multi-employer funds.

The Company argues that if it improperly withdrew recognition from the Union, then instead of requiring the immediate enforcement of the Board's order, this court should predicate enforcement of the order on an election to be held in 90 days. The Company cites the decision in NLRB v. Albany Steel, Inc., 17 F.3d 564 (2d Cir.1994), in support of this argument. The Company also claims that the Board's order is punitive rather than remedial. It grants a windfall to other employers because to make whole the multi-employer funds would require the Company

10. Bishop ignored two lists that Rupert prepared. One list was the basis for Rupert's July 20, 1992, letter to the Union discussed above. The second was an August 12, 1992, list that showed that there were actually 97 strike replacements, four more than Bishop determined to exist. In reaching its decision, the Board assumed arguendo that there were 93 (rather than 97) replaced strikers. We, therefore, think that as the record now stands, Bishop's failure to

rely upon the August 12, 1992, list would not, standing alone, show that Bishop (and the Company) lacked good faith when making the count of eligible voters. However, when coupled with the other facts presented, we also think that the ALJ (and implicitly the Board) could take Bishop's failure to rely upon the August 12, 1992, list into account when determining whether Company had a good faith basis for believing that the Union lacked majority support.

making payments greater than the benefits that Union employees actually received. Instead, the Company suggests that the court should only enforce that portion of the order requiring the Company to resume participation in the funds and to make employees whole for any losses directly suffered as a result of the Company's unilateral decision to change funds and plans. *See Manhattan Eye Ear & Throat Hosp. v. NLRB,* 942 F.2d 151 (2d Cir.1991).

The Board's order will stand. Section 10(c) of the Act, 29 U.S.C. § 160(c), grants the Board broad powers to fashion remedies. The exercise of those powers is for the Board, and this court should not take lightly the Board's determination of the appropriate remedy in any given case. As the Supreme Court has explained:

> A statute expressive of such large public policy as that on which the National Labor Relations Board is based must be broadly phrased and necessarily carries with it the task of administrative application. There is an area plainly covered by the language of the Act and an area no less plainly without it. But in the nature of things Congress could not catalogue all the devices and stratagems for circumventing the policies of the Act. Nor could it define the whole gamut of remedies to effectuate these policies in an infinite variety of specific situations. Congress met these difficulties by leaving the adaptation of means to end to the empiric process of administration. The exercise of the process was committed to the Board, subject to limited judicial review. Because the relation of remedy to policy is peculiarly a matter of administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the dangers of sliding unconsciously from the narrow confines of law into the more spacious domain of policy. On the other hand, the power with which Congress invested the Board implies responsibility—the responsibility of exercising its judgment in employing the statutory powers.

*Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941) (Frankfurter, J.).

In this case, the Board's order is remedial (and not punitive) because the Union and the employees it represents have an interest in ensuring that the funds are made whole. The Company's unilateral decision to cease making contributions to the funds upon presentation of the decertification petition undercut the financial strength of the funds and jeopardized the future benefits to which the employees are entitled.

To the extent that the Second Circuit's decision in *Manhattan Eye Ear & Throat Hospital* reached a contrary conclusion, that decision is inapposite because the *employees* in that case disclaimed any present or future interest in being covered by the funds at issue. 942 F.2d at 157. That is not the case here. *See NLRB v. Transport Serv. Co.,* 973 F.2d 562, 569 & n. 3 (7th Cir.1992).

As for ordering an election, the Second Circuit's decision in *Albany Steel* allows that course of action, but an election is not required under the facts presented here. In *Albany Steel,* the union, which had previously been active, failed to secure a new collective bargaining agreement over a two-and-one-half year period, failed to secure any financial support since the last collective bargaining agreement had expired, and failed to file any grievances on behalf of unit employees. 17 F.3d at 571. Also, employees expressed the belief that the union no longer existed. *Id.* While the Second Circuit held that these factors were insufficient to overcome the Board's determination that the employer lacked a good faith doubt to support a withdrawal of recognition, the Second Circuit ordered an election because such facts were sufficient to place the union's majority support in doubt. *Id.* at 572.

Here, however, the Company does not assert that the Union is inactive or that it has shown an unwillingness to represent the employees either at the bargaining table or in any grievance matter. Also, unlike *Albany Steel,* there is no suggestion that the Union no longer exists. We therefore decline to order an election and encroach upon the remedial powers that Congress has granted the Board.

## VI.

Based on the foregoing reasons, we deny the petition of Virginia Concrete and we grant the cross-petition of the Board and enforcement of its order.

*PETITION DENIED, CROSS–PETITION GRANTED, AND ORDER ENFORCED.*