**ROCK–TENN COMPANY, Petitioner, Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner,**

and

**United Paperworkers International Union, AFL–CIO, CLC and its Local 907, Intervenor.**

**Nos. 95–1347, 95–1706.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 8, 1995.

Decided Nov. 3, 1995.

---

Larry E. Forrester (argued), James Chadwick Hatmaker, Atlanta, GA, for Rock–Tenn Company.

Charles P. Donnelly, Jr., National Labor Relations Board, Contempt Litigation Branch, Washington, DC, Aileen A. Armstrong, John D. Burgoyne (argued), Steven F. Rappaport, National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, William T. Little, National Labor Relations Board, Region 25, Indianapolis, IN, for N.L.R.B.

Nora L. Macey (argued), Macey, Macey & Swanson, Indianapolis, IN, for United Paperworkers International Union, AFL–CIO–CLC, and its Local No. 907.

Before BAUER, COFFEY, and EVANS, Circuit Judges.

BAUER, Circuit Judge.

Rock–Tenn Company ("Rock–Tenn") petitions this court for review of an order issued by the National Labor Relations Board ("Board"). The Board found that Rock–Tenn committed numerous violations of the National Labor Relations Act ("Act"). 29 U.S.C. §§ 151–160. The Board filed a cross-petition seeking enforcement of the order. For the following reasons, we deny Rock–Tenn's petition and enforce the Board's order.

**I.**

Rock–Tenn manufactures, sells and distributes recycled paperboard and related products. On February 22, 1991, following a Board-conducted election, the United Paperworkers Union ("Union") was certified as the exclusive bargaining representative for

Rock–Tenn's production and maintenance employees. Rock–Tenn and the Union began bargaining for an initial contract on May 20, 1991. In late May, an employee, Glenda Sowders, gave Rock–Tenn's General Manager Roy Young a copy of an anti-union petition containing approximately 60 out of a possible 155 or 156 employees' names. The petition stated that: "We the undersigned feel that it is not in our best interests to be represented by the United Paperworkers Union." In June 1991, Sowders resubmitted the same petition with a total of 80 names.

From May 1991 through October 10, 1991, the parties met 15 times and made some progress towards a contract. As of early October, Rock–Tenn had not revealed the existence of the May petition. In late September, while negotiations continued on the initial contract, Sowders and another anti-union employee, Holly Trimble, discussed their opposition to the Union with General Manager Young. Young suggested that they circulate a decertification petition and dictated to them the appropriate decertification language.

Rock–Tenn assisted Trimble in circulating the petition by various means. In mid-October, Sowders gave Young part of the decertification petition with approximately 66 signatures, including 11 employees who had not signed the May petition. Young added these 11 new names to the 80 from the May petition and concluded that over half of the bargaining unit members were dissatisfied with the Union.

At a bargaining session on October 16, 1991, Rock–Tenn's Counsel, Larry Forrester, declared that management had received evidence that the Union no longer had majority support of its members and it therefore would be inappropriate for Rock–Tenn to bargain with the Union beyond the certification year. Accordingly, Rock–Tenn proposed a contract that would expire February 22, 1992. Rock–Tenn did not identify either the May or September petitions as the basis for its belief, stating only that its position was based on objective evidence and should not be taken frivolously.

In response to management's stance, the Union began to shore up its support. On October 17, 1991, the Union held a rally and informed management that more employees had participated in the rally than in any prior demonstration. In response, Forrester reiterated management's position that the Union had lost majority support and repeated Rock–Tenn's insistence on a contract coextensive with the certification year. On October 18, 1991, unit employees soundly rejected Rock–Tenn's contract offer.

In response to management's insistence that the Union lacked majority support, the Union began a drive to collect employees' signatures on membership applications. The parties did not meet again until December 6, 1991. From October until early December, Rock–Tenn actively discouraged the Union's membership drive. Nevertheless, by the time the parties returned to the table on December 6, the Union had collected 91 signed membership cards and Union representative Dan Ferson informed management that the Union had secured signed applications from a majority of unit employees. In response to management's skepticism, Ferson proposed that a neutral mediator check the cards to settle the question of majority support. Rock–Tenn refused. Its offer of a contract coextensive with the certification year was final. Following this meeting, Ferson took Rock–Tenn's offer back to the members, who voted to accept it.

Meanwhile, the anti-union employees were still working on their decertification petition. As of December 6, 1991, the petition contained, at most, 69 signatures. On December 10, 1991, Sowders and Trimble filed their decertification petition with the Board. Also on December 10, the Union wrote to management seeking to negotiate a successor agreement to the contract set to expire on February 22, 1992. The Union requested Rock–Tenn to furnish certain pertinent information. Rock–Tenn responded on February 18 that it refused to release the information and that it would not recognize the Union beyond February 22, 1992. Finally, on February 22, 1992, Rock–Tenn formally withdrew recognition of the Union.

The Union filed a variety of unfair labor practice charges alleging violations of

§§ 8(a)(1), (3), and (5) of the Act, 29 U.S.C. §§ 158(a)(1), (3), and (5), and an administrative law judge ("ALJ") heard the case in January 1993. On May 25, 1993, the ALJ found that Rock–Tenn violated § 8(a)(1) of the Act by unlawfully supporting its employees' September decertification petition. 29 U.S.C. § 158(a)(1). In addition, the ALJ found that Rock–Tenn had engaged in a variety of anti-union activity that violated § 8(a)(1). The ALJ also found that Rock–Tenn had committed a series of § 8(a)(3) violations by discriminatorily disciplining employees for engaging in union activities and by discriminatorily denying employees leaves of absence in order to engage in union activities. 29 U.S.C. § 158(a)(3).

Finally, the ALJ concluded that Rock–Tenn violated §§ 8(a)(5) and (1) of the Act by, inter alia, failing and refusing to bargain in good faith with the Union during the certification year; by insisting on a contract term co-extensive with the certification year; and by withdrawing recognition from the Union at the conclusion of the certification year and thereafter by refusing to meet and bargain with the Union without possessing a reasonable belief based on objective considerations that the Union no longer enjoyed majority support of the unit employees.[1] 29 U.S.C. §§ 158(a)(5) and (1).

As remedies, the ALJ issued a broad cease and desist order prohibiting Rock–Tenn from infringing in any manner on rights guaranteed employees by § 7 of the Act. 29 U.S.C. § 157. The ALJ also ordered Rock–Tenn to bargain with the Union, and extended the Union's initial certification period for another year.

The Board affirmed the ALJ's order, adopting all of the ALJ's legal conclusions except the remedial order where the Board shaved the extension of the certification period from a full year extension to six months. Rock–Tenn petitions this court for review of the Board's order. The Board cross-petitions seeking enforcement of its order.

1. For the sake of clarity, these violations will be referred to collectively as the "8(a)(5) violations."

2. Under NLRB v. J. Weingarten, Inc., 420 U.S. 251, 260, 95 S.Ct. 959, 965, 43 L.Ed.2d 171

## II.

### A. Standard of Review

We have jurisdiction over the parties' petitions pursuant to 29 U.S.C. §§ 160(e) and (f). The Board's findings of fact are "conclusive" when supported by substantial evidence on the record as a whole. N.L.R.B. v. Dominick's Finer Foods, Inc., 28 F.3d 678, 683 (7th Cir.1994). Substantial evidence means evidence that reasonable minds might accept as adequate to support a conclusion. Central Transport, Inc. v. N.L.R.B., 997 F.2d 1180, 1184 (7th Cir.1993). We also review the Board's application of law to fact under the substantial evidence standard. Id. We will uphold the Board's conclusions of law unless they are "irrational or inconsistent with the Act." Id. (quoting U.S. Marine Corp. v. N.L.R.B., 944 F.2d 1305, 1314 (7th Cir.1991), cert. denied, 503 U.S. 936, 112 S.Ct. 1474, 117 L.Ed.2d 618 (1992)). Finally, we give great deference to the Board's choice of remedy. "Once the Board has spelled out the basis for its issuance of a bargaining order, this court's review is limited to whether the Board abused its discretion." Ron Tirapelli Ford, Inc. v. N.L.R.B., 987 F.2d 433, 438 (7th Cir.1993) (quoting Montgomery Ward & Co. v. N.L.R.B., 904 F.2d 1156, 1159 (7th Cir.1990) (citations omitted)).

### B. Issues Presented

Initially, we need to clarify which violations are at issue. Rock–Tenn does not contest the Board's findings that it violated § 8(a)(1) by acts of assistance to anti-union petitions, attempts to interfere with the Board's processes, interrogation, threats of discipline for union activities, and denial of Weingarten[2] rights. Rock–Tenn also does not contest the Board's findings that the company violated § 8(a)(3) of the Act by discriminatorily disciplining employees and discriminatorily denying leaves of absence for engaging in union activities. According-

(1975), employees are entitled to have a union steward present at an investigatory interview where there is a reasonable belief that discipline may result.

ly, the Board's order with respect to these issues is summarily enforced. *U.S. Marine Corp. v. N.L.R.B.*, 944 F.2d at 1314. However, these uncontested violations do not disappear altogether. "[T]hey remain, lending their aroma to the context in which the contested issues are considered." *N.L.R.B. v. Shelby Memorial Hospital Ass'n*, 1 F.3d 550, 567 (7th Cir.1993) (quoting *N.L.R.B. v. Clark Manor Nursing Home Corporation*, 671 F.2d 657, 660 (1st Cir.1982)).

Rock–Tenn's petition is limited to the Board's findings of 8(a)(5) violations. Rock–Tenn argues that the Board's finding that the company violated the Act when it withdrew recognition from the Union and when it offered a contract for the remainder of the certification year is not supported by the record. Rock–Tenn also contests the Board's finding that the May employee petition did not constitute objective evidence to support a good faith belief that the Union lacked majority support. Finally, Rock–Tenn argues that the Board erred in imposing a bargaining order.

### 1. *Objective Evidence of Loss of Majority Status*

Rock–Tenn's petition rises and falls on the question of whether the company had, at various times, a good faith doubt based on objective evidence of the Union's continued majority status. Section 8(a)(5) of the Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representative of his employees ..." 29 U.S.C. 158(a)(5). During the year following a union's Board certified election as collective bargaining representative, the union enjoys an "irrebuttable presumption" of majority support. *National Labor Relations Board v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 777–78, 110 S.Ct. 1542, 1544, 108 L.Ed.2d 801 (1990). After the first year, the presumption continues but is rebuttable. *Id.* at 778, 110 S.Ct. at 1544.

Nonetheless, while the employer cannot rebut the union's majority status and refuse to bargain during the certification year, it may "anticipatorily" withdraw recognition of the union for any post-certification periods by, for example, insisting on a contract coterminous with the certification year. However, the employer's ability to exercise its "anticipatory" challenge to the union is strictly limited to situations where (1) the union does not, in fact, enjoy majority support, or (2) the employer has a good faith doubt, founded on sufficient objective evidence, of the union's loss of majority support. *N.L.R.B. v. Curtin Matheson Scientific, Inc.*, 494 U.S. at 778, 110 S.Ct. at 1544. The employer has the burden of proving a good faith doubt by a preponderance of the evidence and the evidence offered in support of the employer's claim must be "clear, cogent, and convincing." *N.L.R.B. v. Hollaender Mfg. Co.*, 942 F.2d 321, 325 (6th Cir.1991), *cert. denied*, 502 U.S. 1093, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992) (citations omitted).

The Board found that Rock–Tenn never had an objectively reasonable doubt as to the Union's majority status. Therefore, the Board concluded that the company violated § 8(a)(5) of the Act when it (1) conditioned agreement on an initial contract coterminous with the certification year; (2) refused to furnish information and anticipatorily withdrew recognition during the certification year; and (3) withdrew recognition at the end of the certification year and thereafter unilaterally changed a condition of employment.

The company acknowledges that the September decertification petition (not filed until December) could not form the basis of a good faith belief in the Union's loss of majority status because that petition was tainted by the company's unfair labor practices. *Microimage Display Div. of Xidex Corp. v. N.L.R.B.*, 924 F.2d 245, 253 (D.C.Cir.1991). Nevertheless, the company argues that its October 1991 announcement regarding a contract coterminous with the certification year was motivated not by the September petition, but by the May petition. This argument does not pass muster.

An examination of the actual chronology of events in this case demonstrates that the Board's decision regarding the company's October contract offer is supported by the record. In May 1991, the parties began bargaining. A few days later, an employee pre-

sented an anti-union petition to management containing 60 of a possible 155 or 156 signatures. Within the next month, the same employee resubmitted the same petition with a total of 80 names. At this point, the employer had some reason to begin believing that the Union might not have majority support. However, the company did not reveal its alleged doubts about the Union's majority support until October—after the company improperly had begun promoting a decertification petition.

Thus, it is not surprising that the Board found that by October, the May petition had become "stale."[3] The company's argument denying the May petition's staleness is belied by its actions in unlawfully supporting the September 1991 decertification petition. Recall that the company is not contesting the Board's finding that the company unlawfully supported the decertification drive (in addition to committing a variety of other unfair labor practices aimed at defeating the Union's majority support). If the May petition, by itself, provided the good faith basis for anticipatory withdrawal then why was the September petition necessary? Furthermore, the company's myriad unfair labor practices committed between September and October make it difficult to characterize its beliefs about the Union's status in October 1991 as "good faith." Therefore, the Board's finding that the company lacked the authority in October 1991 to insist on a contract coterminous with the certification year is supported by substantial evidence.

The Board's finding that the company violated § 8(a)(5) of the Act by anticipatorily withdrawing recognition of the Union on December 18, 1991 also is supported by

substantial evidence.[4] Once again, the question is whether the company had objective good faith evidence that the Union had lost majority status as of December 18, 1991. The Board points to the staleness of the May petition as of December. This staleness is not based solely on the passage of time. After the company declared in October that the Union had lost majority status, the Union undertook efforts to shore up its support. We find particularly telling the Union's announcement on December 6, 1991 that it had a majority of members' signatures on authorization cards. At this point, leaving aside the September petition as we must, the company was left with balancing the May petition with the December authorization cards. Acting in good faith, the company was free to be skeptical of the Union, but it went too far in refusing the Union's offer of having a neutral mediator authenticate the cards.

As the First Circuit has observed, an employer in Rock–Tenn's position must show that it has taken efforts to "unravel the conflicting messages it had received from its employees in order to determine the extent of true opposition to the Union." *N.L.R.B. v. LaVerdier's Enterprises*, 933 F.2d 1045, 1053 (1st Cir.1991). After all, the company was only free to withdraw recognition based on **objective** good faith evidence of a loss of majority status. Therefore, prior to withdrawing recognition of the Union, Rock–Tenn should have tested its anti-union evidence.[5] Its failure to do so further undermines its claim to have acted in good faith. Thus, the company lacked sufficient objective evidence of the Union's loss of majority status to withdraw recognition anticipatorily in

---

3. The Board found, in part, that this May petition was not adequate grounds for the company's anticipatory withdrawal because the petition was "premature." This fact might be relevant if the company had withdrawn recognition of the Union in May or shortly thereafter. However, the company did not anticipatorily withdraw recognition until October. Therefore, when viewed in the context of the actual chronology of events, the Board's finding that the May petition was "stale" is more relevant than its finding that the petition was "premature."

4. The following analysis demonstrates that the Board's findings regarding the company's insis-

tence on December 6, 1991 on a contract coterminous with the certification year, and its actual withdrawal of recognition on February 22, 1992, are both supported by substantial evidence. The decertification petition is tainted by its attendant unfair labor practices and the May petition was stale.

5. We are not moved by Rock–Tenn's plaint that it was caught between a rock and a hard place in determining the quality of the Union's support. Surely, referring the results of the Union's membership drive to an impartial mediator would not have been unlawful meddling by the employer.

December 1991, and actually in February 1992.

### 2. *Remedy*

■ Given the above discussed violations of the Act, it is not difficult to see why the Board's remedies, including the extension of the certification year and concomitant bargaining order, are wholly appropriate.[6] Initially, we note that the company is not challenging the entire remedial order. Rock–Tenn limits its challenge to the Board's imposition of a bargaining order.

■ The Board's remedial authority is "a broad discretionary one, subject to limited judicial review." *Fibreboard Paper Products Corp. v. N.L.R.B.*, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964). Where, as here, the company's unfair labor practices deprived the Union of its certification year protections, it is certainly appropriate to grant the Union an additional six months in order to resurrect the bargaining process. *Exxel/Atmos, Inc. v. N.L.R.B.*, 28 F.3d 1243, 1248 (D.C.Cir.1994) (stressing appropriateness of bargaining order to remedy bad faith bargaining during certification year); *Colfor Inc. v. N.L.R.B.*, 838 F.2d 164, 167 (6th Cir. 1988). Recall that for a number of months during the certification year, the company engaged in a variety of unfair labor practices that poisoned the bargaining process. The company failed to bargain in good faith by insisting on a contract coterminous with the certification year. It unlawfully withdrew recognition from the Union. Furthermore, it actively undertook to promote a decertification drive. Given these violations, a bargaining order is wholly appropriate.

We are mindful that the extension imposes a potential burden on employee free choice since it reinstates the irrebuttable presumption of majority support for another six months. However, that burden is justifiable in light of the company's interference in the initial certification year, particularly given its unlawful assistance in the decertification process. *See LaVerdiere's Enterprises*, 933

F.2d at 1054 (discussing appropriateness of bargaining order in light of seriousness of unfair labor practices); *United Supermarkets, Inc. v. N.L.R.B.*, 862 F.2d 549, 554 (5th Cir.1989) (unfair labor practices found to undermine the majority status of certified union justified bargaining order). Here, the Board's remedy was properly tailored to redress the company's unlawful destruction of the protected certification year. Accordingly, the Board's remedy was well within its discretion.

### III.

Based on our review of the record, we conclude that the Board's findings are amply supported by the evidence. In addition, we find that the Board's remedial order is proper. Accordingly, the company's Petition for Review is DENIED and the Board's Order is ENFORCED.

---

6. We note that the Board adequately explained the basis for its bargaining order. The Board's reduction of the ALJ's certification year extension from one year to six months demonstrates the Board's adequate consideration of the competing interests embodied in the Act and the necessity to tailor the remedy to the violations.