**VIC KOENIG CHEVROLET, INC.,**
Petitioner, Cross–Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent, Cross–
Petitioner.

Nos. 96–3523, 96–3770.

United States Court of Appeals,
Seventh Circuit.

Argued May 21, 1997.

Decided Sept. 29, 1997.

Wendy L. Nutt, James F. Hendricks (argued), Brittain, Sledz, Morris & Slovak, Chicago, IL, for Petitioner, Cross–Respondent.

Charles P. Donnelly, Jr., National Labor Relations Board, Contempt Litigation Branch, Washington, DC, Elizabeth Kinney, National Labor Relations Board, Region 13, Chicago, IL, Aileen A. Armstrong, William M. Bernstein (argued), National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, Robert S. Seigel, National Labor Relations Board, Region 14, St. Louis, MO, for Respondent, Cross–Petitioner.

Before POSNER, Chief Judge, and BAUER and MANION, Circuit Judges.

POSNER, Chief Judge.

The Labor Board found that the employer improperly withdrew recognition of the union that was the certified bargaining representative of its workers. 321 N.L.R.B. 1255, 1996 WL 496374 (1996). The National Labor Relations Act entitles workers to bargain collectively, or not, as they choose by majority vote of their bargaining unit. 29 U.S.C. §§ 157, 159(a). So even if they have chosen to bargain collectively, and a union has been certified as their bargaining representative, they can revoke that choice and decide to bargain individually with their employer; but this is subject to limitations designed, like the rules governing political representation, to limit the frequency of regime changes. Thus, if a collective bargaining agreement is in force, the workers usually must continue to bargain collectively through their union representative until the agreement expires, *NLRB v. Burns Int'l Security Services, Inc.*, 406 U.S. 272, 290 n. 12, 92 S.Ct. 1571, 1583–84 n. 12, 32 L.Ed.2d 61 (1972); *NLRB v. Dominick's Finer Foods, Inc.*, 28 F.3d 678, 683 (7th Cir.1994); *NLRB v. Katz's Delicatessen of Houston Street, Inc.*, 80 F.3d 755, 760 n. 3 (2d Cir.1996), and there is also a bar against holding a decertification election within a year after a valid representation election or after certification of a union as the representative of the bargaining unit, and within a reasonable time after the voluntary recognition of the union as bargaining agent by the employer. 29 U.S.C. § 159(c)(3); *Brooks v. NLRB*, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954); *Rock–Tenn Co. v. NLRB*, 69 F.3d 803, 808 (7th Cir.1995); *Randall Division of Textron, Inc. v. NLRB*, 965 F.2d 141, 145 (7th Cir. 1992). The Act forbids the employer to interfere with the workers' choice, 29 U.S.C. § 158(a)(1), but is silent on whether, if some or all of the workers want to abandon collective bargaining, he may help them do so.

The standard method for revoking union representation is for the workers to file a petition for decertification with the Labor Board, which, if satisfied that the petition presents a real question of whether the union continues to be supported by a majority of the workers in the unit, will conduct an election, provided none of the election bars mentioned above is in the way. 29 U.S.C. § 159(c)(1); 29 C.F.R. § 101.18(a). But even before the petition is filed or granted, the employer can (subject to the same qualification) stop bargaining with the union if he has a reasonable belief that a majority of the workers in the bargaining unit no longer want to be represented. *Auciello Iron*

*Works, Inc. v. NLRB,* —— U.S. ——, ——, 116 S.Ct. 1754, 1758, 135 L.Ed.2d 64 (1996); *Rock–Tenn Co. v. NLRB, supra,* 69 F.3d at 808; *Lee Lumber & Bldg. Material Corp. v. NLRB,* 117 F.3d 1454, 1458 (D.C.Cir.1997) (per curiam); *NLRB v. Katz's Delicatessen of Houston Street, Inc., supra,* 80 F.3d at 764; *NLRB v. American Linen Supply Co.,* 945 F.2d 1428, 1433 (8th Cir.1991). Even if, as in this case, a collective bargaining agreement is in force, bringing the "contract bar" rule into play, the employer can withdraw recognition so far as negotiating future contracts is concerned. *Rock–Tenn Co. v. NLRB, supra,* 69 F.3d at 808; *Abbey Medical/Abbey Rents, Inc.,* 264 N.L.R.B. 969, 1982 WL 23766 (1982), enforced without opinion, 709 F.2d 1514 (9th Cir.1983).

So far, the parties are on common ground. They diverge when it comes to the amount of assistance that the employer may lawfully provide to the workers' efforts to decertify the union. The employer, an automobile dealer in southern Illinois, claims the right to provide the workers with any assistance that doesn't interfere with their freedom of choice. This is the standard implied by sections 7 and 8 of the Act and explicit in a number of the Board's cases. E.g., *Eastern States Optical Co.,* 275 N.L.R.B. 371, 1985 WL 45678 (1985); *Washington Street Brass & Iron Foundry, Inc.,* 268 N.L.R.B. 338, 339, 1983 WL 24743 (1983). In the present case, however, the Board argues that the employer may provide only "ministerial" assistance; anything more "taints" the workers' efforts fatally. This is a prophylactic rule, also with support in prior Board cases, e.g., *Cummins Component Plant,* 259 N.L.R.B. 456, 460–61, 1981 WL 21032 (1981); *Times–Herald, Inc.,* 253 N.L.R.B. 524, 1980 WL 12610 (1980); cf. *Dayton Blueprint Co.,* 193 N.L.R.B. 1100, 1107–08 (1971), and born either of fear that employers might seek to influence the workers by means too subtle to be detected by the union or proved by the Board, or of a bias in favor of unionization.

The courts have not had to choose between these rules, and have not done so; the cases in which the Board's finding of unlawful assistance has been upheld on judicial review are ones in which the employer had been found to have interfered with the free choice of the employees. E.g., *Rock–Tenn Co. v.*

*NLRB, supra,* 69 F.3d at 808–09; *Caterair Int'l v. NLRB,* 22 F.3d 1114, 1120–21 (D.C.Cir.1994); *NLRB v. American Linen Supply Co., supra,* 945 F.2d at 1433. There would be no practical difference between the employer's and the Board's formulation if "ministerial" meant the same as "not likely to sway the workers one way or the other"; in many cases it does mean just this, see, e.g., *Placke Toyota, Inc.,* 215 N.L.R.B. 395, 1974 WL 11227 (1974); but in some it does not—a good example being *Dayton Blueprint Co., supra,* 193 N.L.R.B. at 1107–08, where the employer's act in carrying the petition for decertification to the Board, after the workers had signed it, was held to be forbidden assistance. Yet neither in that case nor in any other case in which the assistance was rendered after the workers had decided to petition for decertification was this the only form of assistance; in all the cases the employer had also provided assistance that might have affected the decision. *Royal Himmel Distilling Co.,* 203 N.L.R.B. 370, 377, 1973 WL 4385 (1973), intimates that if the only assistance is after the fact, as it were, it is not unlawful.

In its opinion in the present case, the Board expressly endorsed the "no more than ministerial aid" formula, see 321 N.L.R.B. at 1259–60, but failed to indicate whether the formula means anything more than that the employer may not give aid that is likely to affect the outcome of the decertification effort. The Board began its discussion with a quotation from the *Eastern States Optical* case, which had seemed to define "ministerial aid" as aid not likely to affect the outcome. 321 N.L.R.B. at 1259, quoting 275 N.L.R.B. at 372. But elsewhere the opinion in the present case discusses the "ministerial aid" formula as if its interpretation stood free from any reference to the objective of protecting the free choice of the employees, in much the same way that the *Miranda* rule stands free from its underlying objective of preventing coerced confessions: even if the circumstances thoroughly negate any inference of coercion, if the rule is violated the confession must be suppressed. Given the lack of clarity in the Board's standard and the Board's much-criticized yet stubbornly persisted-in reluctance to use its express

rulemaking power to clarify such muddles, see, e.g., *American Hospital Ass'n v. NLRB*, 899 F.2d 651, 655 (7th Cir.1990), aff'd on other grounds, 499 U.S. 606, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1991); *International Union v. NLRB*, 802 F.2d 969, 974 (7th Cir. 1986); *Retail, Wholesale & Department Store Union v. NLRB*, 466 F.2d 380, 388–89 (D.C.Cir.1972); *NLRB v. Majestic Weaving Co.*, 355 F.2d 854, 860 (2d Cir.1966) (Friendly, J.), we are unclear just what the Board's rule is. *Sullivan Industries v. NLRB*, 957 F.2d 890, 897–902 (D.C.Cir.1992); see also *Continental Web Press, Inc. v. NLRB*, 742 F.2d 1087, 1093–94 (7th Cir.1984).

■ We may assume without having to decide that it would not be irrational for the Board to take the strictest view and bar all nontrivial assistance whenever rendered; the argument would be that assistance in filing the petition for decertification could conceivably influence the workers' vote in the subsequent decertification election if one were ordered. This would still be some distance from interfering with free choice; choices are made on a weighing of influences. And the bearing of the free-speech clause in the National Labor Relations Act, 29 U.S.C. § 158(c), would have to be considered, though it is not argued that the clause entitles employers to engage in as it were continuous campaigning to persuade their employees to forgo collective bargaining, and it is the very core of the rule whose scope is in issue in this case that the employer may not urge his employees to seek decertification. E.g., *NLRB v. United Union*, 915 F.2d 508, 509, 512 (9th Cir.1990); *Twin City Concrete, Inc.*, 317 N.L.R.B. 1313, 1321, 1995 WL 451928 (1995); *Allou Distributors, Inc.*, 201 N.L.R.B. 47, 53, 1973 WL 4953 (1973). We need not pursue these fascinating byways. The Board's previous cases, as we have seen, do not announce or instantiate the strict rule; and the Board in the present case, while seeming to flirt with the rule, did not purport to adopt it, attempt to square it with the Board's previous decisions, or offer a justification for it. In these circumstances, we cannot treat it as a rule of labor law. *International Union v. NLRB, supra*, 802 F.2d at 973–74; *Continental Web Press, Inc. v. NLRB, supra*, 742 F.2d at 1093–94; *Bro-Tech Corp. v. NLRB*, 105 F.3d 890, 896–97

(3d Cir.1997); *Sullivan Industries v. NLRB, supra*, 957 F.2d at 902. The Board's decision must rise or fall by its consistency with the unquestioned standard that the employer must not, by his assistance to the employees who are seeking to disconnect from the union, interfere with employee free choice.

Which brings us at last to the facts. In June of 1993, shortly before the expiration of a collective bargaining agreement between the Koenig dealership and the machinists' union under which the union was the exclusive bargaining representative for a unit consisting of the eleven mechanics employed by the dealership, the mechanics began discussing among themselves whether they wanted to continue to be represented by the union. In July, one of them, Blair, asked the Labor Board for information about how to decertify the union. We do not know what the Board told him, but from his subsequent conduct it appears that the Board outlined for him the mechanics of the decertification process. On August 10 the mechanics held a meeting at which they voted on the following question propounded by Blair: "Do you wish to stay in the Union?" Those present at the meeting—10 of the 11 mechanics—voted 6 to 4 to remain.

■ The next day, Rader, the union's shop steward, told the mechanics that Vic Koenig, the president of the dealership, was unhappy with the vote and wanted all the mechanics to participate in the voting. The Board found that this was a lie; Rader had not spoken to Koenig. Why the union's shop steward would invent such a lie is unilluminated by the record; we can but speculate that he hoped that a second vote would be more lopsided in favor of the union, either because Koenig's supposed interference would get the back up of some of the workers who had voted to abandon the union or because the worker who hadn't voted would vote for the union. The Board found, quite properly in our view, that Rader's lie, not even being known to Koenig at the time, could not be used as a basis for finding that Koenig had interfered improperly with the workers' choice whether to continue to be represented by the union. Rader had neither actual nor apparent authority to make

representations on Koenig's behalf. *Hyster Co. v. NLRB*, 480 F.2d 1081, 1083–84 (5th Cir.1973).

At all events, a second vote was conducted on August 13, on the question, drafted by Rader, "Do you wish to remain in the union?" Blair told the workers that if they voted in the negative he would prepare a petition for decertification for them to sign. In this second vote, the workers voted 7 to 4 to leave the union. Blair then prepared individual petitions that said that the "undersigned wish to withdraw our membership from" the union, and gave a copy to each of the workers together with an envelope, and the workers returned the sealed envelopes to him. This was the third vote; for the moment, its results were unknown.

Koenig was informed of the outcome of the second vote. In a subsequent conversation Blair told him that the workers wanted to make sure that their votes would remain confidential. Koenig suggested that either a minister or a lawyer (we are touched at the suggestion of their interchangeability) unseal the envelopes containing the individual petitions and count the votes. Blair indicated a preference for the lawyer, who was summoned, arrived, verified the signatures on the petitions, and announced that the vote was 7 to 4 against the union. This was a lawyer who had done some legal work for Koenig in the past but was not Koenig's labor lawyer. When Koenig described the results of the vote to his labor lawyer, that lawyer told Koenig that the petitions had been worded incorrectly; the employees should have been asked not whether they wanted to belong to the union but whether they wanted the union to represent them. Koenig relayed this information to Blair, who prepared a new set of petitions which said "I do not want the Union to represent me anymore." Blair explained to the other workers that the previous petitions had been worded incorrectly. They revoted, also on August 13—it was the third vote of the day, the fourth vote in all. The new vote was 6 to 4 against representation, one of the workers having left work before the voting. Upon being informed of the outcome, Koenig wrote the union that he no longer recognized it as the mechanics' bargaining representative.

The assistance that Koenig rendered Blair, while not trivial, was not likely—the Board did not find that it was likely—to influence the mechanics' decision about whether to stick with the union. The assistance that troubled the Board the most was Koenig's relaying to Blair the lawyer's advice that the wording of the first set of petitions had been technically incorrect. The only way in which this assistance could have affected the outcome of the final vote would have been if one or more of the workers who voted against the union had wanted to resign their membership in the union but had wanted the union to continue to represent them in bargaining with Koenig. Of this desire there is not the slightest indication; indeed, we do not even know whether any of the workers was a member of the union. To be a union member means, functionally, to pay full union dues. The law does not require a worker to belong to a union even if it is the exclusive representative of the bargaining unit to which he belongs. He has to pay an agency fee representing the fraction of the union dues that goes to defray the expenses of the union's bargaining activities (from which he benefits as a member of the bargaining unit—the union is his agent as well as that of the union members), but he doesn't have to pay the rest of the dues or allow his name to be included in the union's list of its members. *Communications Workers v. Beck*, 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988); *Wegscheid v. Local Union*, 117 F.3d 986, 987 (7th Cir.1997); *Finerty v. NLRB*, 113 F.3d 1288, 1290 (D.C.Cir.1997).

This is not what the four votes were about. You don't need a vote to quit a union; it's your individual right. You can't be coerced by majority vote to belong to a union, or coerce a minority who would like to belong to the union to quit. A majority is important only if what is at stake is continued representation, which was what was at stake here. Not being a lawyer, Blair didn't know how to word the petition properly, and this is where the employer's assistance was important—or might have been, for the Labor Board's staff that processes decertification petitions might not have been worried by the technically inapt wording of the petition. There isn't a hint in the record that what the mechanics

were concerned with was not representation but rather the portion of their union dues over and above the agency fee. In these circumstances Koenig's assistance could not have "tainted" the proceedings, that is, have swayed undecided workers in favor of decertification. It was assistance after the fact, after the workers had indicated a strong preference for decertification, and the Board doesn't have, or at least doesn't yet have, a valid rule forbidding such assistance. The other assistance that the Board mentioned in its opinion, such as the counting of the votes by Koenig's lawyer, also took place after a majority of the workers had manifested their desire for decertification.

Far from being likely to have deflected the workers from the path of their true preferences, Koenig's assistance helped them to stay on it. Consider what Blair would have done had Koenig not suggested a change in the wording of the petition. Blair would presumably have forwarded the results of the first vote by the workers on August 13 to Koenig, who would have called his labor lawyer with this important news, who would have advised Koenig that the wording of the petitions was incorrect. Then what? If Koenig were forbidden to communicate this information to Blair, on pain of being found to have violated the National Labor Relations Act, the petitions would have languished in Koenig's office until—until what? If Blair asked Koenig what had happened to the petitions, would Koenig have been required to remain silent? Then what? Would Blair think to carry the petitions to the Labor Board? To hire his own lawyer? But he probably couldn't afford to do that, or know how to go about finding a lawyer. And if instead he had gone directly to the Labor Board, what would the Board's staff have told him? Its initial response to his inquiry had not been sufficiently informative to enable him to draft a proper petition; he is after all an automobile mechanic rather than a labor lawyer. One hopes the staff would not have stumbled over the inept wording, although Koenig's lawyer must have been concerned about that possibility or he wouldn't have suggested that the petitions be reworded.

Against this it can be pointed out that Koenig didn't have to wait for a decertification election in order to withdraw recognition, and so if Blair had dropped the ball out of ignorance of how to proceed before the Board, the harm to the workers' freedom of choice might not have been fatal. The standard method for revoking union representation, as we mentioned earlier, is the decertification petition and election. An alternative method, however, as we know—for it was the one employed here—is for the employer to withdraw recognition on the basis of clear evidence that a majority of the employees don't want to be represented by the union. E.g., *Auciello Iron Works, Inc. v. NLRB, supra,* —— U.S. at ——, 116 S.Ct. at 1758; *NLRB v. Phoenix Pipe & Tube, L.P.,* 955 F.2d 852, 857 (3d Cir.1991). But the fact that Koenig didn't have to wait for Blair to act in order to withdraw recognition can hardly help the Board; all it can do is bolster Koenig's alternative ground for challenging the Board's order—that he reasonably believed that the union had lost his workers' support before he rendered any support to their decertification endeavor.

The Board thought that the lawyer's recommendation to reword the petitions shows that Koenig didn't think he had an objective basis for withdrawing recognition until the last ballot—a ballot that the Board thought tainted by Koenig's intervention—dispelled any possible ambiguity in the earlier votes. 321 N.L.R.B. at 1260. With all due deference to the Board, we consider that a completely unreasonable inference. Neither Koenig nor the lawyer had any doubt about what the workers wanted, for, as we said, there is nary a hint that they might simply have wanted to reduce the amount of dues they were paying, by quitting the union. The lawyer was merely trying lawyer-fashion to dot all his i's and cross all his t's. (He is, no doubt, kicking himself for having been so meticulous; he has been punished for being careful.)

The Board also reasoned that whatever Koenig believed, the ambiguity in the wording of the earlier petitions deprived him of any objective basis for thinking that the union had lost the workers' support. Yet no one could have doubted what the workers meant; and in other cases the Board has

allowed employers to infer a lack of support for union representation from artless statements. *Industrial Waste Service, Inc.,* 268 N.L.R.B. 1180, 1186, 1984 WL 36088 (1984) ("We don't want the Union"); *Sofco, Inc.,* 268 N.L.R.B. 159, 1983 WL 24722 (1983) ("do away with the union," "get rid of this lousy union," etc.). There was no more doubt here than there was in any of those cases about what the workers wanted; the only doubt was about the technical sufficiency of the wording of the petitions.

So even if Koenig unlawfully assisted the workers to perfect their petition for decertification—and he did not—his withdrawal of recognition from the union was still proper, because it was based on the clear evidence of the first vote on August 13, before Koenig rendered any assistance, that the union had lost the support of a majority of the workers. As there is an independent ground upon which the Board's order is invalid, there would be no point in remanding the case to permit the Board to consider whether to adopt the strict rule against employer assistance, the usual course when an order is set aside because the Board's position is unclear. See, e.g., *International Union v. NLRB, supra,* 802 F.2d at 974–75; *Continental Web Press, Inc. v. NLRB, supra,* 742 F.2d at 1094; *Bro–Tech Corp. v. NLRB, supra,* 105 F.3d at 897; *Sullivan Industries v. NLRB, supra,* 957 F.2d at 902.

The Board's order is denied enforcement with regard to the employer's withdrawal of recognition of the union. The other parts of the order are not contested, and so are enforced.

ENFORCED IN PART, DENIED ENFORCEMENT IN PART.