UNIROYAL TECHNOLOGY CORP.,
Petitioner–Cross–Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent–Cross–Petitioner.

Nos. 97–3529, 97–3859.

United States Court of Appeals,
Seventh Circuit.

Argued April 24, 1998.

Decided Aug. 6, 1998.

Jay W. Kiesewetter (argued), Kiesewetter, Wise, Kaplan, Schwimmer & Prather, Mem-

phis, TN, for Petitioner–Cross–Respondent in No. 97–3529.

Cary Schwimmer, Jay W. Kiesewetter (argued), Kiesewetter, Wise, Kaplan, Schwimmer & Prather, Memphis, TN, for Petitioner–Cross–Respondent in No. 97–3859.

John D. Burgoyne, Sonya Spielberg (argued), National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, William T. Little, National Labor Relations Board, Region 25, Indianapolis, IN, for Respondent–Cross–Petitioner in No. 97–3529.

John D. Burgoyne, Frederick Havard, Sonya Spielberg (argued), National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, Roberto G. Chavarry, National Labor Relations Board, Region 25, Indianapolis, IN, for Respondent–Cross–Petitioner in No. 97–3859.

Before POSNER, Chief Judge, and ROVNER and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Statements about the duty of courts to defer to administrative agencies appear frequently in judicial opinions, yet it is not always apparent what they mean. From time to time, slightly defensive appellate judges assure the parties before them that they are not acting as rubber stamps for the agencies whose work is under review. The line between respect for a decision with which one might disagree personally and blind deference can be elusive. The case before us is a difficult one, and we are not without sympathy for the company's point of view. Nonetheless, after a careful review of the record we have concluded that our duty is to give effect to the administrative law judge's decision and to require enforcement of an order of the National Labor Relations Board (NLRB) finding that petitioner, Royalite Thermoplastics Division of Uniroyal Technology Corporation (Royalite), committed unfair labor practices when, among other things, it discharged employee Alfredo Lozano because of his union activities.

I

This is the second time this court has considered an aspect of the contentious union organization drive that took place at Royalite's Warsaw, Indiana, plant between October 1994 and February 1995. As we noted in *Uniroyal Technology Corp. v. NLRB*, 98 F.3d 993 (7th Cir.1996) (*Uniroyal I*), that drive resulted in a union victory by the narrow margin of 62 to 60 votes. Our decision in *Uniroyal I* upheld the Board's order certifying the union as the victor and ordering Uniroyal to bargain with it. Thereafter, the Board's General Counsel filed a new complaint against Royalite alleging a variety of unfair labor practices. Specifically, the General Counsel alleged that eight supervisors engaged in unfair anti-union behavior during the election and that Royalite's termination of Lozano was an unfair labor practice prohibited by § 8(a)(1) and 8(a)(3) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1), (3).

After a hearing before an administrative law judge (ALJ), the Board prevailed on almost all charges. The ALJ found that seven of the eight alleged incidents of company misconduct during the organizing campaign had occurred and violated § 8(a)(1) by restraining and coercing employees in the exercise of protected union activity. The ALJ also found that Lozano's discharge violated § 8(a)(1) and 8(a)(3). Before this court Royalite has not challenged the ALJ's findings except with regard to Lozano's discharge. As the Board points out, it is therefore entitled to summary affirmance and enforcement of all other parts of the ALJ's order. *See, e.g., NLRB v. Champion Laboratories, Inc.*, 99 F.3d 223, 227 (7th Cir. 1996). These uncontested violations color our analysis of Lozano's discharge. *Id.*, citing *Rock–Tenn Co. v. NLRB*, 69 F.3d 803, 808 (7th Cir.1995). While Royalite in this court has tried to argue against our summary affirmance of the uncontested charges and especially against using these charges as a lens through which to view the contested charge, it has not offered any reason why we should not conclude that it waived the former points. Nor has it persuaded us to ignore our previous, and commonsense, view

that a company that does not dispute its responsibility for multiple prohibited practices is more likely to have engaged in an additional one than a company which has not been found to have engaged in any other prohibited practice. *Id. See also Van Vlerah Mechanical, Inc. v. NLRB*, 130 F.3d 1258, 1264 (7th Cir.1997) ("Circumstantial evidence suggesting anti-union motivation includes the timing of the discharge, the employer's reliance on pretextual justifications and the employer's antiunion bias as demonstrated, for example, by other contemporaneous violations of the Act."). The question before us, in any event, is whether substantial evidence supports the ALJ's conclusions that Royalite discharged Lozano because of its desire to discourage union activities and that Royalite's stated reason for its action (which we describe below) was pretextual. As we show below, the evidence in the record was sufficient either with or without these additional considerations.

Several facts about Lozano's employment at Royalite and his termination are undisputed. First, Lozano was active in the union organizing campaign. *See Uniroyal I*, 98 F.3d at 996. Second, he was a successful employee at Royalite prior to the time the union organizing campaign began. He received nothing but glowing performance reviews, he was always willing to fill in on overtime shifts, his supervisors had him train other employees, he wrote a training manual, and he was invited to (and did) join the plant's Total Quality Management advisory board as a worker-representative. Third, he had a criminal past that he did not disclose on his application for employment at Royalite, notwithstanding the fact that the application included a question asking whether he had "ever been convicted of any criminal offense other than a traffic violation."

In fact, as everyone eventually learned, Lozano had an unsavory past. As a youth he was a gang member in Chicago, and he had a variety of run-ins with the authorities. (Royalite did not learn of these instances prior to terminating Lozano, however, so they do not shed light on its motivations for doing so. Compare *McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352, 360, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995).) In 1985, after moving to Warsaw, Indiana, where Royalite's plant is located, Lozano was arrested on federal felony cocaine charges. He pleaded guilty, was sentenced to five years in prison, and spent 42 months in the federal prison in Lexington, Kentucky. In prison, Lozano participated in several drug-treatment programs, and he turned to religion, becoming a born-again Christian. After he was released from prison, he became an active anti-drug and anti-gang advocate, devoting particular efforts to warning religious youth groups about the evils of drugs.

Lozano's first introduction to Royalite came in 1992 through David Antu, a member of Warsaw's Spanish-speaking community who knew Royalite's then-manager of human resources, Joseph Bell. Antu told Bell that Lozano was a "good man," a preacher who could not earn a living wage by preaching and needed a job. Bell told both Lozano and Antu that Royalite hired only through the State Employment Office, and he suggested that Lozano go there and put his name on the Uniroyal list. Lozano did so. Shortly thereafter, Bell followed up with an invitation to Lozano to apply for employment. It was then that Lozano filled out the employment application falsely indicating that he had not been convicted of "a criminal offense other than a traffic violation" and signing his name to a certification that all information on the application was correct and any false or missing information could be cause for discharge. Also during this interview, Bell mentioned to Lozano that Royalite ran criminal records checks, verified previous employment information, and conducted drug screening tests on all applicants. He promised Lozano he would call when that process was complete.

Apparently unbeknownst to Lozano, Bell never conducted the criminal records check. Lozano was hired on July 6, 1992, and as we noted above, he was a model employee in Royalite's eyes until the union campaign started. Importantly for present purposes, the ALJ found that Lozano's criminal past was well known at the plant, both among the rank-and-file and among supervisors. For example, Lozano testified that he told Supervisor Michael DeWald that he had spent time

in prison, and why. DeWald alluded to Lozano's "trouble" in front of another employee, Ralph Crawford. DeWald admitted that Lozano had shown him a newspaper clipping about his arrest. Although DeWald testified that he did not realize that Lozano had later been convicted, the ALJ found that statement "incongruous," and credited Lozano's account of DeWald's knowledge of Lozano's criminal past. Corroborating Lozano's testimony about DeWald's knowledge, employee Rex Alan Rife recalled a conversation at which DeWald, Rife, and Lozano were all present, when Lozano told DeWald about his gang experience, the drugs, his arrest, his incarceration, and how that experience led him to his religious rebirth. The ALJ credited Rife's testimony on this point and thus necessarily rejected the testimony of Royalite's witnesses, who all said that they were unaware until after the union objection hearing that Lozano had been convicted or imprisoned. The ALJ also reviewed the testimony of other employees, whose accounts were essentially the same as Rife's, concluding that

> [t]he credited evidence is that Lozano did not attempt to conceal his past from the Warsaw employees or superiors and that both his criminal past and his Christian conversion was [sic] well known through the Warsaw plant.

Again, in the ALJ's words "[e]verything went well for Lozano in the work place until after the Union commenced its organizational campaign." As we described in *Uniroyal I*, Royalite filed objections to the election after the union's narrow victory. See 98 F.3d at 996. During the investigation of those objections, Royalite's attorney learned that Lozano was a felon and that he had not disclosed that fact on his job application. Lozano was a major witness at the hearing on the objections. At that hearing Royalite's attorney directly asked Lozano whether his answer to the question about prior crimes on the application was true; Lozano immediately replied "no." Lozano also freely admitted that he had been convicted of distributing cocaine and that he had served time for his offense, and said that he had made a mistake in checking "no" on the application. At a later meeting regarding his suspension Lozano explained further "that he had filled out many applications and most of them asked if you had been convicted in the last 5 years, this is a mistake on my part and a technicality on your part."

The company continued its investigation of Lozano's past after the hearing. It suspended Lozano on March 21, 1995, the day he testified at the objections hearing, allegedly because of the misrepresentation on his application, and then discharged him on March 28, 1995. Royalite contended before the ALJ and continues to argue here that it would never have hired Lozano if it had known that he had falsified his application, and that its policy was never to retain an employee who it later learned it would not have hired initially. Again, however, the ALJ had evidence before him tending to show that the rule at Royalite was not so inflexible. Bell, the manager who had hired Lozano, had hired two felons who were on parole, even though neither one of them had been involved with drugs (one had participated in a burglary, which for some reason Bell did not regard as "job related"). Bell had also hired persons who had been drug users, though as far as the record shows he had not hired drug distributors before. Last, while two employees found to have falsified their employment applications were terminated, the ALJ found that both were fired for alternate reasons—the one for incompetence, the other since his employment violated Royalite's anti-nepotism policy (the reason listed on his termination papers).

Based on all of this, the ALJ concluded that Royalite did not in fact have an absolute, undeviating policy of discharging an employee for falsification of an employment application. This alleged policy was instead a pretext to cover up its real motive for discharging Lozano, namely, his pro-union activities. Specifically, the ALJ said that he was "convinced that Lozano would not have been discharged if he had not engaged in protected union activities. On the credible record it is clear that Respondent offered an implausible and false explanation for Lozano's discharge." The ALJ accordingly found, and the Board agreed, that Royalite violated

§ 8(a)(1) and 8(a)(3) of the NLRA when it fired Lozano.

## II

Royalite's appeal amounts to a series of challenges to the ALJ's findings of fact and credibility determinations. It argues that union animus played no part in the decision to discharge Lozano, because it would have fired him regardless of his union activities once it learned of his misrepresentation on the application; it claims that the ALJ's credibility determinations were unsupported by substantial evidence; and it argues that the Board's conclusion was nothing more than impermissible second-guessing of management's decision to enforce the "falsification policy." For its part, the Board emphasizes the evidence that supported the ALJ's conclusions, including the company's knowledge and disapproval of Lozano's union activities, its prior knowledge of his criminal history and the fact that it waited until after he became a union activist to discharge him, and the more flexible nature of its policy regarding misstatements on applications.

We agree that the issues here relate to the facts found by the ALJ, and to its credit Royalite appears to realize the enormity of its burden on appellate review. The ultimate task for the Board, and thus for the ALJ, was to determine why Royalite discharged Lozano. Was it because Lozano engaged in union activities, a classic violation of § 8(a)(3) and 8(a)(1), see, *e.g.*, *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 400–03, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983); *Dreyer's Grand Ice Cream, Inc. v. NLRB*, 140 F.3d 684, 689 (7th Cir.1998), or was it because higher management finally learned that Lozano had misrepresented his checkered past on his application form (or, perhaps, because of the nature of his past itself)? This question—the reason for the discharge—is a question of fact, and thus we must uphold the ALJ's and the Board's answer to that question as long as it is supported by substantial evidence on the record as a whole. NLRA § 9(e), 29 U.S.C. § 160(e); *Dilling Mechanical Contractors, Inc. v. NLRB*, 107 F.3d 521, 523–24 (7th Cir.1997), *cert. denied*, —— U.S. ——, 118

S.Ct. 165, 139 L.Ed.2d 108 (1997). Credibility determinations in particular, we have repeatedly said, "are entitled to considerable deference and will be overturned by a reviewing court only when extraordinary circumstances so require." *Id.*; see also *Dreyer's*, 140 F.3d at 690; *NLRB v. Gerig's Dump Trucking, Inc.*, 137 F.3d 936, 940 (7th Cir.1998) ("We owe particular deference to the Board's findings regarding the credibility of witnesses, which we do not disturb absent extraordinary circumstances such as clear bias by the ALJ, utter disregard of uncontroverted sworn testimony, or acceptance of testimony that on its face is incredible.") (citations omitted); *NLRB v. Joy Recovery Technology Corp.*, 134 F.3d 1307, 1312 (7th Cir.1998) ("We avoid redetermining credibility on the basis of a cold record.") (citations omitted). Royalite argues that the ALJ and Board inappropriately substituted their own views for the company's on whether Lozano *should* have been fired, and that these views do not deserve deference. This mischaracterizes the ALJ's findings and the Board's decision. Both instead analyzed the factual record to determine Royalite's real motivation for terminating Lozano. While it is a truism that management makes management decisions, not the Board, see, *e.g.*, *Midwest Stock Exchange, Inc. v. NLRB*, 635 F.2d 1255, 1265 (7th Cir.1980), it remains the Board's role, subject to our deferential review, to determine whether management's proffered reasons were its actual ones.

Here, the ALJ made a number of credibility findings that we cannot say were unsupported by the record. He believed Lozano and Rife when they reported that Lozano's past was well known among supervisors at the plant. He believed Lozano's testimony that he accidentally erred in filling out his application, and viewed Lozano's willingness to have Bell conduct an investigation into his criminal record as circumstantial evidence supporting that assertion. Lozano's ready admission of his past at the objection hearing provided further support for this view. (Even were we to disagree with this credibility determination by the ALJ and Board it would not alter our analysis, since the crucial determination in this case is *Royalite's* intent in terminating Lozano, not whether Lozano

intentionally lied three years before that termination.) With respect to Royalite's own policies, the ALJ relied on Bell's failure to follow up with the background investigation and the company's prior treatment of similar incidents of false statements on application forms and criminal histories as evidence tending to show that the alleged policy (of firing all employees who would not have been hired initially but for those false statements) was not as straightforward as Royalite argued. And perhaps most importantly in light of Royalite's knowledge of Lozano's past, the ALJ found the timing of the company's decision to discharge Lozano compelling evidence that the discharge was really because of Lozano's role in the union organizing campaign, not because of his application or his past. See *Van Vlerah*, 130 F.3d at 1264.

This is obviously not a case in which all the evidence pointed one way, but in the real world such cases are rare. The record easily could have supported a decision that Royalite only learned with the certainty it needed about Lozano's misrepresentation and the precise kind of crime he had committed in preparing for and at the objection hearing, and that it took immediate action in accordance with its policies at that time. One might even wonder whether the ALJ was too credulous to have credited Lozano's account as thoroughly as he did, or if the ALJ might have had some hidden desire to encourage someone who had apparently made great efforts to turn his life around after some early serious mistakes. But the record contains no support for those theories, and it is not our job to engage in speculation. Once we have found, as we do here, that the ALJ and then the Board have made a choice between two fairly conflicting views of the evidence, the substantial evidence standard of review requires us to defer to the Board's decision. *Joy Recovery*, 134 F.3d at 1312; *NLRB v. Augusta Bakery Corp.*, 957 F.2d 1467, 1473 (7th Cir.1992) ("[T]he substantial evidence standard does not allow us to reject the Board's choice between two fairly conflicting views.") (citing *NLRB v. Stor–Rite Metal Prods., Inc.*, 856 F.2d 957, 964 (7th Cir. 1988)).

For these reasons, we find that Royalite has not shown that the Board's decision was unsupported by substantial evidence, and we order the decision ENFORCED.